UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

VIRGINIA PAIGE JENKINS :
*ADMINISTRATRIX* of :
the ESTATE OF ERIN JENKINS, :
:
     Plaintiff, :
:
:
v. :    Case No.: 3:15cv00355
:
SHERIFF C.T. WOODY, :    JURY TRIAL DEMANDED
:
DEPUTY E. BEAVER, :
:
JOHN AND JANE DOE DEPUTIES, :
:
NURSE CRISSY ROYALL, :
:
NURSE AIKYSHA PAIGE, :
:
KHAIRUL BASHAR :
MOHAMMED EMRAN, M.D. :
:
and :
:
CORRECT CARE SOLUTIONS, LLC, :
:
     Defendants. :

## COMPLAINT

COMES NOW Plaintiff, Virginia Paige Jenkins ("Plaintiff") as *Administratrix* of

the Estate of Erin Jenkins (the "Estate") by counsel, and moves this honorable Court for

judgment against Sheriff C.T. Woody, Jr. ("Woody"); Deputy E. Beaver ("Deputy

Beaver"); John and Jane Doe Deputies; Correct Care Solutions, LLC ("CCS"); Dr.

Khairul Bashar Mohammed Emran ("Dr. Emran"); Nurse Crissy Royall ("Nurse

Royall"); Nurse Aikysha Paige ("Nurse Paige"). In support of her Complaint, Plaintiff states as follows:

## INTRODUCTION

1.      This Complaint asserts claims pursuant to 42 U.S.C. §1983.

2.      Ms. Jenkins is survived by statutory beneficiaries under Virginia's wrongful death statute (Virginia Code §8.01-50 and §8.01-53).

3.      This Complaint details violations of the Eighth Amendment of the Constitution of the United States of America by Defendants, jointly and severally, occurring in the Richmond City Justice Center (the "Justice Center").

4.      This Complaint further details gross negligence on the part of Defendants Woody, Deputy Beaver and John and Jane Doe Deputies, all of whom are responsible, jointly and severally, for gross negligence under Virginia state law resulting in the death of Ms. Jenkins. Further, the Complaint details medical malpractice claims against Dr. Emran, Nurse Royall and Nurse Paige, all of whom are responsible, jointly and severally, for medical malpractice under Virginia state law resulting in the death of Ms. Jenkins.

5.      Defendant Woody was responsible for operating the Justice Center so as to not endanger the health and safety of those incarcerated or detained at the Justice Center. Woody failed to provide a humane and livable environment at the Justice Center, failed to effectively operate the Justice Center, failed to perform his duties to ensure constitutional health care for inmates, including Ms. Jenkins, and failed to prevent cruel and unusual conditions. Through action and inaction, Woody was grossly negligent and demonstrated deliberate indifference to human life, including that of Ms. Jenkins, in violation of her constitutional rights.

6.      Defendant Woody also maintained a policy and custom of deliberate indifference to the inmates housed in the medical and mental health areas of the Justice Center. Woody knew that his deputies and medical contractors failed to adequately monitor and care for the health and safety of inmates in theses areas, but took no action to ensure adequate and necessary care was provided to inmates in the medical and mental health areas of the Justice Center.

7.      Defendant Deputy Beaver and John and Jane Doe Deputies (sometimes collectively referred to as "Deputies") failed to provide a humane and livable environment at the Jail, failed to effectively operate the Jail, failed to perform their duties to care for inmates, including Ms. Jenkins, and failed to prevent cruel and unusual conditions. Through action and inaction, the Deputies were grossly negligent and demonstrated deliberate indifference to human life, including that of Ms. Jenkins, in violation of her constitutional rights.

8.      Defendant CCS maintained an official policy or custom that manifested deliberate indifference to the serious medical needs of inmates/detainees at the Justice Center, including Ms. Jenkins. As a result of this official policy or custom of deliberate indifference, CCS both failed to prevent and was a direct proximate cause of constitutional deprivations resulting in Ms. Jenkins' death. In particular, CCS deliberately chose not to investigate serious negative clinical outcomes of patients (e.g. sentinel events and/or critical clinical events) in order to cover up its failure to provide adequate and timely care at correctional facilities across the country. This policy and/or custom of failing to investigate and correct significant medical errors resulted directly in

the failure to address and treat Ms. Jenkins in a constitutionally adequate and timely matter, resulting in her unfortunate and untimely death.

9.      Defendants Dr. Emran, along with Nurse Royall and Nurse Paige (collectively "Nurses") failed to provide necessary, adequate, and timely medical care to Ms. Jenkins. Through action and inaction, Dr. Emran and Nurses failed to prevent and directly caused Ms. Jenkins' death through their gross negligence and deliberate indifference to Ms. Jenkins' life, in violation of her constitutional rights.

10.     Collectively, Defendants failed to provide necessary, adequate and timely medical care and/or attention in response to Ms. Jenkins' serious medical needs. Through action and inaction, Defendants failed to prevent and directly caused Ms. Jenkins' fatal injuries through their gross negligence and deliberate indifference to human life, in violation of her constitutional rights.

## JURISDICTION

11.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§1331 and 1343, over Ms. Jenkins' 42 U.S.C. § 1983 claims.

12.     This Court has Jurisdiction over these claims as they arise under the Constitution of the United States of America and have been brought before this Court pursuant to 42 U.S.C. § 1983.

13.     This Court has jurisdiction over the state law claims as alleged herein, including claims alleged pursuant to Virginia Code §8.01-50.

14.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367(a), because the alleged claims arising under Virginia law are

so related as to form part of the same case or controversy arising under Ms. Jenkins' 42 U.S.C. § 1983 claims.

VENUE

15.     Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

16.     Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

17.     The Plaintiff, Virginia Paige Jenkins, is the *Administratrix* of the Estate. Plaintiff is, and has at all relevant times has been, a resident of the Commonwealth of Virginia.

18.     Defendant Woody, as Sheriff of the City of Richmond, is a constitutional officer.  Woody operated, directed and supervised the Justice Center and his deputies.  At all times while Ms. Jenkins was an inmate in the Justice Center, Woody had a duty to maintain the custody and to ensure the care of Ms. Jenkins, and otherwise delegated that duty to his deputies, agents and employees.  Woody is sued in his individual and/or official capacity as charged herein.

19.     Defendant Deputies were deputies, agents and/or employees of Sheriff Woody.  These Defendants were on duty and assigned to work in the area where Ms. Jenkins was housed at the time of her serious need for medical attention, or otherwise had responsibilities related to Ms. Jenkins.  Deputies are sued in their individual capacities.

20.     Defendant CCS is contracted to provide Medical Services and Resident Care for the Justice Center.  Pursuant to its contract with Woody, CCS receives in excess of four million dollars per year to provide constitutionally adequate health care services at the Justice Center.  CCS and its employees, including Dr. Emran and Nurses, as agents or contractors of Woody, are charged with providing adequate, appropriate and timely medical care to inmates, including Ms. Jenkins, at the time of her incarceration and injuries.  Due to its official policy and custom of deliberate indifference, CCS failed to meet these responsibilities, manifesting in deliberate indifference to human life, including that of Ms. Jenkins and resulting in the death of Ms. Jenkins.

21.     Defendant Nurses are licensed medical providers employed by CCS to provide medical services at the Jail.   Nurses were responsible for providing constitutionally adequate, appropriate, and timely care to inmates and detainees, including Ms. Jenkins, at all relevant times leading up to her death.  Nurses failed to meet these threshold responsibilities, were grossly negligent, and showed deliberate indifference to human life, including that of Ms. Jenkins, resulting in her death.  Nurses are sued in their individual capacities.

22.     Defendant Dr. Emran is a Virginia licensed medical doctor employed by CCS to provide physician services at the Jail.  Dr. Emran was responsible for providing constitutionally adequate, appropriate, and timely medical care to inmates and detainees, including Ms. Jenkins, at all relevant times leading up to her death.  Dr. Emran failed to meet these threshold responsibilities, was grossly negligent, and showed deliberate indifference to human life, including that of Ms. Jenkins, resulting in her death.

23.     All Defendants are persons acting under color of state law pursuant to 42 U.S.C. §1983.

FACTS

24.     Ms. Jenkins was born on December 30, 1985.

25.     Ms. Jenkins was incarcerated at the Justice Center on or about July 25, 2014.

26.     At the time of her entry into the Justice Center, Ms. Jenkins was healthy. Particularly, records from the Justice Center indicate she **no** "major medical problems."

27. At the time of entry into the Justice Center, Ms. Jenkins had a prescription for Mobic and Percocet.  Importantly, the Mobic prescription and safety information warns: "NSAIDs cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal."

28.     At the time of her entry into the Justice Center, Ms. Jenkins was noted to be "not apparently under influence of alcohol or drugs," and her mental state was noted to be "alert, appropriate, logical, etc."  Nevertheless, Ms. Jenkins was referred to "Chronic and Mental."

29.     Ms. Jenkins was placed on an opiate withdrawal protocol and her Percocet was, upon information and belief, discontinued.

30.     On July 30, 2014, Ms. Jenkins was seen by a member of CCS' health care staff, who reclassified her and ordered that she be moved to isolation allegedly for mental health reasons.  This reclassification and mental health isolation was done without evaluation, documentation or explanation.  No plan was created to have Ms. Jenkins seen or evaluated by any mental health professional.  Instead, Ms. Jenkins was suddenly

classified as mentally unstable, but nothing whatsoever was done to document, evaluate or treat this condition other than changing Ms. Jenkins' bunk assignment. Presumably, this reclassification was approved by Dr. Emran and Woody.

31.    On July 31, 2014, Ms. Jenkins was seen by Dr. Emran, who noted that she should be transferred to medical and housed on the bottom bunk of her new housing assignment.

32.    On July 31, 2014, Dr. Emran noted that Ms. Jenkins had a history of Percocet abuse, noted that Ms. Jenkins was "oriented, but also hallucinating," and noted that she was "thirsty." Ms. Jenkins' physical examination was, however and inconsistently, noted as "unremarkable." Ms. Jenkins was given Gatorade.

33.    On July 31, 2014, Ms. Jenkins was apparently relocated to "2 MED FEMALE" with indication of "Medical/Mental Health."

34.    No evaluation was performed or documented on July 31, 2014 to determine or record Ms. Jenkins' alleged degree of dehydration or electrolyte imbalance. This is especially unusual given that Ms. Jenkins was given meclizine without explanation. Meclizine is an antihistamine that contributes to dehydration and delirium. Apparently, Dr. Emran and his staff presumed, without evaluation, that Ms. Jenkins was a drug addict in withdrawal, contrary the documented findings on intake.

35.    Further, Dr. Emran failed to evaluate Ms. Jenkins' allegedly suspected hallucinosis, a potentially life threatening sign of withdrawal that warranted further evaluation. Instead, the medical notes reflect that in the same visit, Ms. Jenkins, who was apparently hallucinating, was determined by Dr. Emran to have an "unremarkable" examination. The records show, however, that Ms. Jenkins had lost three pounds at this

point (135 to 132 pounds) within only six days, which was a symptom of severe dehydration. In fact, her presentation was anything but "unremarkable."

36.     At this time, it should have been obvious that Ms. Jenkins was suffering from a perforating ulcer, which clearly perforated on or before Jul 31, 2014. At the very least, it should have been clear that Ms. Jenkins was had a serious need for medical attention. Nevertheless, Ms. Jenkins' serious and potentially life-threatening symptoms and need for appropriate treatment were virtually totally ignored by Dr. Emran and the CCS' medical staff, including Nurses.

37.     On August 1, 2014, Ms. Jenkins was evaluated by Nurse Royall for a reported punch to the face, but no trauma was noted. Importantly, this was an alleged change in Ms. Jenkins usual behavior pattern, but, again, Ms. Jenkins was not properly evaluated and her symptoms were virtually ignored. Ms. Jenkins was obviously seriously ill, but her symptoms were totally ignored by Nurse Royall and, presumably Dr. Emran and other members of the CCS medical staff.

38.     On August 1, 2014, Ms. Jenkins "Clinical Opiate Withdrawal Scale" ("COWS") allegedly went from '0' to '6'. This change is an extremely unexpected outcome on the seventh day of her alleged withdrawal from opiates. Nevertheless, Ms. Jenkins was not evaluated, despite important changes in her pulse, anxiety and restlessness. All of Ms. Jenkins symptoms demonstrated increasing delirium, but these symptoms where totally ignored by Dr. Emran, Nurse Royall (who apparently completed the COWS sheet) and other members of the CCS medical staff.

39.     On August 2, 2014, Ms. Jenkins was found laying half on her bunk and half off. She was incoherent, incontinent and found not breathing. Quizzically, CPR was

not immediately initiated. Rather, Justice Center deputies made meaningless reports of Ms. Jenkins medical condition, without calling for an emergency medical 10-18. Finally, and far too late, an emergency call was made. Nurses arrived and finally administered CPR, noting absence of breath sounds and pulse. AED was applied and CPR continued until EMS arrived at approximately 2330 hours. The needless and unexplainable delay in responding appropriately and timely to Ms. Jenkins condition directly caused or contributed to her death.

40.     Leading up to the call for medical emergency, Deputies Beaver and Deputies failed to make regular and appropriate security checks on Ms. Jenkins. Although Ms. Jenkins was severely ill and in obvious distress, Deputy Beaver and Deputies failed to provide any assistance to Ms. Jenkins and failed to obtain timely medical attention for her obvious serious medical needs.

41.     Specifically, Deputy Beaver observed Ms. Jenkins on one security round having "urinated on the floor and bed of her cell." Deputy Beaver asked Ms. Jenkins what was wrong, but "couldn't understand" her response because it was "jumbled." Deputy Beaver, however, did not call a medical 10-18. Instead, Deputy Beaver simply reported the incident to Nurse Paige and resumed regular rounds. When Nurse Paige did not immediately respond, Deputy Beaver did nothing.

42.     On a subsequent round, Deputy Beaver noticed that Ms. Jenkins had "no chest movement." At this point, Deputy Beaver reported to her superiors, but did not immediately initiate CPR or other emergency life saving measures. Allegedly, Deputy Beaver "tried to call a medical 10-18, but could not get through." So Deputy Beaver

continued to do nothing to save Ms. Jenkins' life. Instead, Deputy Beaver simply waited until others eventually responded to the situation.

43.     Upon information and belief, John and Jane Doe Deputies also failed to do anything to aid Ms. Jenkins during this critical time when her serious need for medical attention was most obvious.

44.     Inexplicably, when Deputy Beaver reported these observations to Nurse Paige, Nurse Paige also did nothing. She did not respond and did not call for immediate medical attention for Ms. Jenkins' obvious serious medical need.

45.     By the time other deputies and nurses finally responded to Ms. Jenkins on August 2, 2014, she was critically ill as a result of a condition that had been ignored by the medical and jail staff, including those Defendants as described herein.

46.     Ms. Jenkins was transported to MCV hospital where she was placed on life support, but ultimately died. At the time of her arrival at MCV, Ms. Jenkins had suffered life-threatening injuries due to the Defendants' deliberate indifference to her serious medical needs. Ultimately, Ms. Jenkins died as a direct proximate result of the Defendants' deliberate indifference and gross negligence.

47.     An autopsy revealed Ms. Jenkins died as a result of an untreated perforated duodenal ulcer, resulting in acute peritonitis.

48.     Although all Justice Center deputies are supposedly trained in CPR and basic first aid, Deputy Beaver and John and Jane Doe Deputies did nothing to aid Ms. Jenkins during her obvious and life-threatening period of distress. Although Deputy Beaver and John and Jane Doe Deputies are supposed to be "first responders," they failed to respond in any way whatsoever to Ms. Jenkins' obvious serious medical needs.

49.     All Justice Center deputies are supposed to be trained on how to make security rounds, including observation of inmates and detection of those in need of medical care. This alleged training requires prompt notification of medical personnel and/or calling a medical 10-18 when observing an inmate/detainee, such as Ms. Jenkins, with and obvious serious medical need. Despite the obviousness of Ms. Jenkins' serious medical need, however, Deputy Beaver and John and Jane Doe Deputies took no meaningful action and were deliberately indifferent to Ms. Jenkins' condition. This behavior is consistent, unfortunately, with the known history of Woody's deputies in monitoring and/or responding to inmates/detainees with serious medical needs.

50.     First responder training for Justice Center deputies is essential training. Nevertheless, there is a long history of known failures by Richmond Sheriff's Office deputies to perform basic CPR and to provide basic first aid for inmates/detainees when necessary. There is also a long history of known failures by deputies of the Richmond Sheriff's Office in making necessary security rounds and in responding to inmates in obvious need of medical assistance. These failures have regularly resulted in injury and death of inmates/detainees confined in Richmond jail facilities. Despite these known failures, Woody has taken no steps to ensure the proper training of his deputies and has taken no remedial action to prevent future injuries and deaths as a result of these failures. In fact, Woody has been and continues to be deliberately indifferent to injuries and deaths that occur at the Justice Center and other Richmond jail facilities.

51.     These ongoing failures to address serious medical needs of inmates/detainees is tragic, but unsurprising. Woody has previously stated under oath that he is "not responsible" for those incarcerated in Richmond jail facilities.

52.     The Code of Virginia and the Virginia Administrative Code demonstrate that Woody is, in fact, responsible for the operations of local jail facilities, including inmate care. Virginia Code §15.2-1609 states that Woody is legally responsible for "the custody, feeding and care of all prisoners confined in the county or city jail." Virginia Code §53.1-126 makes Woody responsible for ensuring treatment for all inmates' "communicable diseases, serious medical needs, or life threatening conditions." Further, 6 VAC 15-40-20 shows that Woody is responsible for ensuring "Minimum Standards" at the Justice Center, including timely and appropriate access to medical care (6 VAC 15-40-380) and twenty-four hour emergency medical care (6 VAC 15-40-360). To ensure that this medical care is accessible, Woody is responsible for the training and competency of his staff (6 VAC 15-40-390).

53.     In fact, Woody's own Standards of Procedure and organizational structure provide that he is ultimately responsible and has authority over matters at the Justice Center involving policy, procedure, operations and discipline.    Included in these Standards of Procedure are policies and procedures governing security, counts, grievances, classification, housing and medical operations.

54.     Further, the Justice Center's Inmate Handbook makes inmates aware of and subject to the Justice Center's rules, including the policies of 24-hour emergency medical care, availability of "licensed health care providers" on all jail shifts, and access to a medical doctor upon request.

55.     Ms. Jenkins' preventable and untimely death demonstrates that Woody failed to ensure that proper training or quality assurance was in place to reduce or eliminate preventable injury and death at the Justice Center, and further shows that the

Woody remains deliberately indifferent to preventable injury and death of inmates/detainees at the Justice Center and other Richmond jail facilities.

56.    For years, CCS has failed to follow and/or implement policies and procedures for conducting Continuous Quality Improvement ("CQI"), Critical Clinical Event ("CCE") investigations, root-cause analyses, and other forms of morbidity and mortality reviews so as to control and reduce the occurrence of negative clinical outcomes within its facilities, specifically the Justice Center and its predecessor, the Richmond City Jail.

57.    CCS maintains a CCE reporting system, intended to report "sentinel events," clinical events with significant implications for patients, and clinical events that are "high risk" and worthy of monitoring and/or investigation.

58.    This CCE system, in theory, requires reporting of important events to CCS' corporate headquarters and review by members of CCS' corporate leadership.

59.    Appropriately handled CCEs require root-cause analyses to determine the cause of negative clinical outcomes and to establish criteria for minimizing risk of similar negative outcomes in the future, including improvement plans.

60.    In addition to improvement plans and CQI, CCS' policy and procedure mandates CQI for prevention of negative clinical outcomes.

61.    Essential to the CCE, CQI, root-cause analysis and improvement plan process is an investigative and review process that examines the negative clinical outcomes and develops measures to mitigate future problems.

62.    CCS' failure to investigate negative clinical outcomes within its facilities is a result of its desire to deter creation of self-incriminating evidence.  This self-

interested and deliberate practice is maintained in absolute indifference to the health and safety of patient-inmates under its care, including specifically those in the Justice Center and other CCS facilities.

63.    In fact, CCS is required by its own policies and procedures to analyze each and every adverse or "near-miss" clinical event.

64.    CCS' own in-house counsel has previously confirmed that CCS discourages reporting negative clinical outcomes.

65.    Additionally, CCS' Chief Medical Officer, Dr. Dean Reiger, has previously admitted under oath that CCS' lawyers discourage investigations in instances where there is anticipation of future litigation.

66.    Dr. Reiger has previously admitted under oath that CCS' failures to investigate negative clinical outcomes constitute an overall failure by CCS to follow its own written policies and procedures.

67.    In other words, CCS' does (and has admitted to) having an unwritten policy of not following its written policies and procedures (*i.e.* CCS' admits deliberate indifference to the health and safety of inmate/detainees these policies and procedures are intended to protect.)

68.    CCS' contract with the City of Richmond and/or Woody (the "Contract") provides that it will fully staff the medical department at the Justice Center.

69.    The Contract further requires that CCS comply with standards established by the American Correctional Association ("ACA"), the National Commission on Correctional Health Care ("NCCHC"), the Virginia Department of Corrections

("VDOC") and all applicable federal and Virginia statutes and regulation pertaining to the delivery of health care at "Community Standards."

70.    CCS has failed to comply with the Contract, ACA, NCCHC, VDOC, federal, Virginia and constitutional guideline and requirements, and, in general, standards and regulations pertaining to the timely, adequate and appropriate delivery of health care at the Justice Center (and previously at the Richmond City Jail).

71.    Had CCS conducted investigations into prior CCEs (including sentinel events and negative clinical outcomes), at the Richmond City Jail, the Justice Center or other facilities, it would have implemented additional measures that would have prevented Ms. Jenkins' death.

72.    Ms. Jenkins' death is not the first instance of death or serious injury resulting from constitutionally inadequate attention and/or medical care at Richmond jail facilities overseen by Woody and CCS.   By virtue of other lawsuits, internally documented incidents and incidents reported in the media, Woody and CCS (and their employees and/or agents) have long known of and understood that inmates/detainees have and continue to suffer death or serious injury as a direct result of constitutionally deficient policies, procedures, CQI protocol, CCE review, medical care and the like while incarcerated at Richmond jail facilities, including the Justice Center.

DEFENDANTS' DUTIES

73.    At all times relevant to this action, all Defendants had duties to Ms. Jenkins, an inmate, pursuant to the Eighth Amendment of the U.S. Constitution and also under Virginia law as described herein.

74.     Defendants Woody and Deputies were, among other things, required to provide Ms. Jenkins and all other inmates and detainees, with constitutionally appropriate housing and constitutionally appropriate access to medical care. Defendants also were obligated to take reasonable measures to provide for the safety of Ms. Jenkins.

75.     Defendants Woody and Deputies also owed statutory and common law duties of care to Ms. Jenkins, including affirmative duties to provide adequate and safe conditions of detention, including access to medical care.

76.     Defendant Woody has a constitutional obligation to not maintain, condone or otherwise permit perpetuation of policies and/or customs resulting in indifference to the medical needs or conditions of confinement of those housed in the Justice Center.

77.     Particularly, Defendant Woody is responsible for the day-to-day operations and maintenance at the Richmond City Jail.

78.     Defendant Woody had the duty of care and custody for Ms. Jenkins. While she was confined in the Richmond City Jail, Ms. Jenkins was in the custody and under the care of Defendant Woody and his deputies, employees and agents, including Defendant Deputies.

79.     In connection with Ms. Jenkins' state law claim, Defendant Woody is accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of his deputies, agents and employees.

80.     Defendant Woody, by and through his deputies (including Deputy Beaver and the Deputies) and Defendants CCS, Dr. Emran, and Nurses, had statutory duties to provide medical treatment to Ms. Jenkins under Virginia Code § 53.1-126. Under that statute, the Sheriff and jail personnel have a specific responsibility to inmates that

"medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions."

81.      Defendants CCS, Dr. Emran, and Nurses were, among other things, required to provide Ms. Jenkins and all other inmates and detainees with constitutionally appropriate access to medical care, constitutionally adequate medical care and constitutionally timely medical care.

82.      Defendant CCS has a constitutional obligation to not maintain a policy or custom of deliberate indifference to the medical needs and/or risk of harm to patients at its facilities, including the Justice Center.

<u>COUNT I</u>
§1983 Defendant Woody – Policy or Custom of Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment

83.      Plaintiff incorporates paragraphs 1 through 82 and 91 through 151 of this Complaint, as if fully set forth herein.

84.      This claim against Defendant Woody is brought in his individual capacity.

85.      According to state law, regulations and practices, Defendant Woody was the decision and policy maker for the operations and general inmate care at the Justice Center prior to and at the time of Ms. Jenkins' death. Defendant Woody knowingly and deliberately failed to implement policies and procedures to ensure constitutionally adequate access to medical care, failed to ensure proper training to ensure timely and appropriate access to medical care, failed to operate the jail in a constitutional manner, and otherwise failed to prevent and was deliberately indifferent to the cruel and unusual conditions at the Justice Center.

86.     Through his actions and inactions, Defendant Woody, acting under color of state law and pursuant to an official policy or custom, operated and maintained the Justice Center and trained his deputies, employees, and agents in a manner that posed a risk to the health and safety of the inmates/detainees, including failing to operate the facility and train the staff to care for and protect the inmates/detainees and failing to provide adequate medical care to the inmates/detainees, resulting in the death of Ms. Jenkins.

87.     Defendant Woody had direct, personal, and specific knowledge of the constitutionally inadequate operations, medical care and training at the Justice Center, and engaged in an official policy or custom representing a deliberate indifference towards the inmates/detainees in the period leading up to Ms. Jenkins' death.

88.     The policy or custom was manifest in certain affirmative decisions and omissions by Defendant Woody, as well as by a persistent and widespread practice of deliberate indifference to the needs of the inmates/detainees sufficient to constitute an official custom.   The policy or custom may be inferred from, among other acts, Defendant Woody's failure to act despite a known pattern of constitutional deprivations that have occurred under his watch, as well as ongoing and pervasive lack of adequate operations, training and discipline to deal with these deprivations.  Further, the policy or custom may be inferred from Defendant Woody's failure to remedy these or related conditions that, left unaddressed, were patently likely to cause (and in the case of Ms. Jenkins did cause) constitutional deprivations to the inmates/detainees to whom Defendant Woody owed affirmative duties of care.  Further, Defendant Woody was at all times deliberately indifferent to the Eighth Amendment rights of inmates/detainees

requiring access to timely, adequate and appropriate medical care, resulting in the death of Ms. Jenkins.

89.     Defendant Woody's official policy and custom manifested in deliberate indifference to and a deprivation of Ms. Jenkins' constitutional rights under the Eighth Amendment, in addition to other rights discussed herein. This official policy or custom was a direct proximate cause of Ms. Jenkins' death.

90.     WHEREFORE, Defendant Woody's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

COUNT II
§1983 Claim Against Sheriff Woody (Supervisory Liability) – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment

91.     Plaintiff incorporates paragraphs 1 through 90 and 99 through 151 of this Complaint, as if fully set forth herein.

92.     Defendant Woody, in his individual capacity, while acting under color of state law, was through action and inaction deliberately indifferent to the constitutional rights of inmates/detainees, including Ms. Jenkins.

93.     Defendant Woody was aware that inmates/detainees were frequently denied access to adequate, timely and appropriate medical care, resulting in the inmates'/detainees' exposure to needles harm and suffering, but failed to take steps to adequately monitor inmates/detainees or to provide access to necessary medical care.

94.    Defendant Woody knew or should have known that the serious medical needs of Ms. Jenkins were going unaddressed and that she was allowed to suffer without access to appropriate and constitutionally required care.

95.    Defendant Woody failed to take steps to remedy or prevent the danger to Ms. Jenkins, although he knew that deputies, including Defendant Deputies, engaged in conduct that endangered the health and safety of inmates/detainees, including Ms. Jenkins.  Among the failures known to Defendant Woody was the failure by deputies, including Defendant Deputies, to perform proper security and health checks, failure to properly monitor inmates/detainees, failure to ensure that inmates/detainees were housed in appropriate areas, failure to respond to inmate/detainee grievances and failure to respond to or provide inmates/detainees access to care for serious medical needs.  These unaddressed failures manifested in the indifference to Ms. Jenkins' serious need for medical care, and were a direct proximate cause of her death.

96.    Defendant Woody failed to properly manage and supervise Justice Center operations and failed to ensure that appropriate procedures, protocols and disciplinary measures were in place to prevent constitutional deprivations at the Justice Center, including constitutionally required attention to the serious medical needs of inmates/detainees, such as Ms. Jenkins.

97.    Defendant Woody's acts and omissions constitute willful, wanton, reckless, conscious and deliberate indifference and disregard of Ms. Jenkins' constitutional rights, such that Ms. Jenkins is entitled to recover punitive damages.

98.    WHEREFORE, Defendant Woody's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983,

for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

COUNT III

§1983 Claim Against Deputy Beaver and John and Jane Doe Deputies – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment

99.     Plaintiff incorporates paragraphs 1 through 98 and 109 through 151 of this Complaint, as if fully set forth herein.

100.     Defendant Deputies, in their individual capacities, while acting under color of state law, were through action and inaction deliberately indifferent to Ms. Jenkins' basic human needs during her confinement, including her need for medical care, amounting to a violation of Ms. Jenkins' Eighth Amendment rights.

101.     Defendant Deputies knew that Ms. Jenkins' basic human needs were not being met and that she was subject to cruel and unusual suffering. Specifically, Defendant Deputies knew that Ms. Jenkins had a serious medical need that if, unaddressed, presented a patent and actual danger to Ms. Jenkins.

102.     Despite this knowledge and the ability to take action to respond to Ms. Jenkins' condition and provide assistance, Defendant Deputies were deliberately indifferent to Ms. Jenkins' serious medical needs.

103.     Defendant Deputies failed to properly monitor and/or respond to Ms. Jenkins' obvious symptoms of severe illness.

104.     Deputy Beaver specifically failed to respond in any meaningful or timely way to Ms. Jenkins obvious serious medical need for attention on or about August 1, 2014. When faced with Ms. Jenkins' clear and indisputable need for emergent medical attention, Deputy Beaver did absolutely nothing to ensure that Ms. Jenkins received

timely emergency medical care. Deputy Beaver further failed or refused to perform proper security checks and was otherwise deliberately indifferent to the suffering of Ms. Jenkins and her obvious and serious medical needs.

105. John and Jane Doe Deputies similarly failed to make proper security checks, failed to respond to Ms. Jenkins' obvious serious medical needs and failed to provide Ms. Jenkins timely access to medical care. John and Jane Doe Deputies were deliberately indifferent to Ms. Jenkins.

106. Defendant Deputies deliberate indifference to Ms. Jenkins' obvious serious medical needs was a direct proximate cause of her death, insofar as Defendant Deputies' failures to act delayed or prevented Ms. Jenkins' access to life saving medical care.

107. Defendants Deputies' actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Ms. Jenkins' constitutional rights, such that Ms. Jenkins is entitled to recover punitive damages.

108. WHEREFORE, Defendant Deputies' violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

COUNT IV

§ 1983 Claim Against Nurse Royall, Nurse Paige and Dr. Emran – Deliberate Indifference to Serious Medical Needs

109. Plaintiff incorporates paragraphs 1 through 108 and 120 through 151 of this Complaint, as if fully set forth herein.

110.    Through their actions set forth above, Defendants Nurses and Defendant Dr. Emran, in their individual capacities, while acting under color of state law, acted in a manner that was deliberately indifferent to Ms. Jenkins' basic human needs during his confinement, including her serious medical need for care and attention, amounting to a violation of Ms. Jenkins' Eighth Amendment Rights.   These Defendants' deliberate indifference to Ms. Jenkins' serious medical needs is so egregious as to implicate the Eighth Amendment's explicit ban on cruel and unusual punishment.

111.    Defendants Nurses and Defendant Dr. Emran knew about Ms. Jenkins' documented medical needs and symptoms, including Ms. Jenkins' altered mental state. These Defendants knew that Ms. Jenkins' basic needs were not being met and that the treatment offered was totally insufficient in addressing Ms. Jenkins' symptoms.   These Defendants totally failed to diagnose Ms. Jenkins, and instead placed her in mental segregation without explanation and without any meaningful plan to monitor and treat her deteriorating medical condition.

112.  Defendants Nurses and Defendant Dr. Emran were aware that Ms. Jenkins' symptoms of serious perforating duodenal ulcer and sepsis manifested, but they disregarded Ms. Jenkins' symptoms and failed to treat her, despite knowing that Ms. Jenkins required adequate medical care.

113.    Defendant Dr. Emran failed to even acknowledge Ms. Jenkins' symptoms, failed to attempt to diagnose her and requested that she be segregated due to mental health issues, despite his confusing conclusion that she was appropriately oriented. Defendant Dr. Emran was obviously indifferent to Ms. Jenkins' serious medical needs

and failed to address or attempt to address her symptoms in any meaningful way whatsoever.

114.    Defendant Nurse Royall totally failed to acknowledge or follow up on Ms. Jenkins' serious medical needs in any way.

115.    Defendant Nurse Paige failed to respond at all to requests for treatment of Ms. Jenkins on August 1, 2014, despite reports that she had become incontinent and extremely disoriented.

116.    Defendant Nurses and Defendant Dr. Emran were deliberately, recklessly and wantonly indifferent to Ms. Jenkins' health and grossly negligent in the care (or lack thereof) provided to Ms. Jenkins' as demonstrated by:

i.      Recklessly disregarding Ms. Jenkins' vital signs and symptoms of severe infection.

ii.     Recklessly disregarding appropriate and customary guidelines for dealing with patients who present with potential infection or sepsis; failing to provide appropriate treatment for Ms. Jenkins' symptoms; allowing nurses to diagnose and practice outside the scope of their license (including relying on under-qualified nurses or staff to diagnose Ms. Jenkins); recklessly disregarding the need for adequate access to a physician; failing to provide timely access to care; recklessly disregarding the orders of a physician to follow up on serious symptoms; recklessly disregarding Ms. Jenkins' need for appropriate monitoring; recklessly disregarding reports that Ms. Jenkins required urgent medical assistance; and failing to send Ms. Jenkins for emergency care at an adequate and appropriate time)

117.   The acts and omissions of these Defendants amounts to deliberate indifference to Ms. Jenkins' serious medical needs, and were a direct proximate cause of Ms. Jenkins death.

118.   Defendants Nurses and Defendant Dr. Emran's acts and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Ms. Jenkins' constitutional rights, such that Plaintiff is entitled to recover punitive damages.

119.   WHEREFORE, Defendants Nurses and Defendant Dr. Emran's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

<u>COUNT VI</u>
§1983 Defendant CCS – Policy or Custom of Deliberate Indifference to the Serious Medical Needs of Inmates

120.   Plaintiff incorporates paragraphs 1 through 119 and 132 through 151 of this Complaint, as if fully set forth herein.

121.   Defendant CCS maintained an unwritten policy of deliberate indifference to the serious medical needs of inmates/detainees confined in its facilities, including the Justice Center.

122.   Defendant CCS failed to establish, audit, maintain, amend or otherwise implement polices and procedures to ensure that the serious medical needs of inmates/detainees are addressed in a timely and adequate manner.

123.   Defendant CCS failed to establish, audit, maintain, amend or otherwise implement policies and procedures to ensure that inmates/detainees are not denied access to medical attention for serious medical needs.

124.   Defendant CCS has a policy or custom of deliberate indifference in investigating and responding to sentinel events, CCEs and other negative clinical outcomes at its facilities, including the Justice Center.   This policy or custom of indifference resulted in failures by Defendant CCS to provide minimal constitutional care to inmates/detainees with serious medical needs, including Ms. Jenkins.

125.   As a result, Defendant CCS failed to establish or follow any meaningful policy or procedure for dealing with the serious medical needs of inmates/detainees at the Justice Center, including Ms. Jenkins.

126.   Because of this policy or custom of indifference, Defendant CCS' medical operations (or lack thereof) at the Justice Center posed a recognizable and patent risk to the health and safety of the inmates/detainees, including Ms. Jenkins.

127.   Defendant CCS, through its high ranking officers, legal staff, medical directors and other agents had direct and specific knowledge of the constitutionally inadequate operations, training, discipline and medical care at the Justice Center, and engaged in an official policy or custom manifesting in deliberate indifference to the serious medical needs of the inmates/detainees housed there in the period leading up to Ms. Jenkins' death.

128.   The policy or custom was manifest in certain affirmative decisions and omissions by Defendant CCS, as well as by a persistent and widespread practice of deliberate indifference to the needs of the inmates/detainees sufficient to constitute an

official custom. The policy or custom may be inferred from, among other things, Defendant CCS' failure to act despite a known pattern of constitutional deprivations, including prior litigation related to its policy and custom of indifference, as well as ongoing and pervasive lack of proper operations, discipline, review and training to deal with these deprivations. Further, the policy or custom may be inferred from Defendant CCS' failure to remedy or investigate sentinel events, CCEs and other negative clinical outcomes that, left unaddressed, were patently likely to cause (and in the case of Ms. Jenkins did cause) constitutional deprivations to the inmates/detainees to whom Defendant CCS owed affirmative duties of care. Instead, Defendant CCS was at all times deliberately indifferent to the Eighth Amendment rights ensuring timely, adequate and appropriate medical care of inmates/detainees, resulting in the death of Ms. Jenkins.

129.    Defendant CCS' official policy or custom of deliberate indifference to the serious medical needs of inmates/detainees allowed the deliberate indifference to the serious medical needs of inmates/detainees at the Justice Center to perpetuate, and was a direct proximate cause of Ms. Jenkins' death.

130.    Defendant CCS' acts and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Ms. Jenkins' constitutional rights, such that Plaintiff is entitled to recover punitive damages.

131.    WHEREFORE, Defendant CCS' violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory and/or punitive damages in the amount to be established at trial, and attorneys' fees and costs.

<u>COUNT VII</u>
State law Claims Against Defendant Sheriff Woody and Deputies – Gross Negligence

132.    Plaintiff incorporates paragraphs 1 through 131 and 141 through 151 as if fully set forth herein.

133.    While she was incarcerated in the Justice Center, Ms. Jenkins was reliant on the care of Defendant Woody and his deputies, including the Defendant Deputies. These Defendants had a duty to exercise reasonable care with regard to Ms. Jenkins while she was confined in the Justice Center.   These Defendants had specific duties to reasonably ensure that Ms. Jenkins was not subject to unnecessary suffering and that she had reasonable access and attention to her medical needs.

134.    Defendant Woody is liable for his own acts and omissions, and is also vicariously liable under the doctrine of *respondeat superior* for the acts and omissions of his deputies and employees, including Defendant Deputies.

135.    Defendant Woody and Defendant Deputies, as described herein, breached their duties to Ms. Jenkins and were otherwise indifferent or grossly negligent in monitoring Ms. Jenkins and addressing her serious medical needs.

136.    Defendant Deputies completely neglected Ms. Jenkins safety, and completely failed to monitor or respond to her serious condition.   In fact, Defendant Deputies disregarded their duties and ignored Ms. Jenkins' obvious, life-threatening symptoms.

137.    Defendant Woody completely disregarded known failures in his policies and procedures to monitor the health and safety of inmates/detainees in the Justice Center. Defendant Woody further failed to properly monitor and supervise those under his direction and control, despite knowing that his deputies, including the Defendant

Deputies, were not properly monitoring or responding to those inmates/detainees with serious medical needs.

138.    As a direct proximate result of these Defendants grossly negligent conduct, Ms. Jenkins died.

139.    As a direct proximate result of these Defendants' grossly negligent conduct, Ms. Jenkins' was subject to needless and unusual suffering, pain, mental anguish and incurred medical bills.

140.    As a direct proximate result of these Defendants' grossly negligent conduct, the surviving beneficiaries of Ms. Jenkins' have suffered and will continue to suffer sorrow, mental anguish, loss of companionship, loss of comfort and guidance, medical bills, funeral bills, loss of income and support and other related bills and expenses.

<u>COUNT VIII</u>
State law Claims Against Defendants Woody, Nurses and Dr. Emran – Medical Negligence

141.    Plaintiff incorporates paragraphs 1 through 140 as if fully set forth herein.

142.    Defendant CCS was at all relevant times a private medical contractor providing medical services and treatment to inmates/detainees at the Justice Center.

143.    Defendant Nurses and Defendant Dr. Emran were at all relevant times private employees of Defendant CCS.

144.    Defendant Woody's duty to ensure constitutionally appropriate medical care to inmates/detainees at the Justice Center is non-delegable.  Therefore, Defendant Woody is also vicariously liable for the acts and omissions of Defendant Nurses and Defendant Dr. Emran.

145.    Defendant Nurses and Defendant Dr. Emran each had duties to administer medical care and treatment to Ms. Jenkins in conformity with the standards of delivery of medical care and treatment in Richmond and the Commonwealth of Virginia.

146.    As a result of the negligence of Defendant Nurses and Defendant Dr. Emran, Ms. Jenkins did not receive any evaluation for or treatment for her duodenal ulcer, sepsis and her otherwise obvious serious medical symptoms and pain were ignored for an extended period of time.

147.    The failure of Defendant Nurses and Defendant Dr. Emran to provide proper medical treatment to Ms. Jenkins caused her to suffer excruciating pain and permanent serious injuries, including but not limited to cardiac arrest, sepsis, perforation of the duodenal ulcer and death.

148.    The condition(s) from which Ms. Jenkins suffered and died were caused by the negligence of Defendant Nurses and Defendant Dr. Emran, including but not limited to:

a.    Failure to consider differential diagnoses for Ms. Jenkins' conditions and symptoms;

b.    Failure to properly diagnose and treat Ms. Jenkins' duodenal ulcer;

c.    Failure to properly manage and prescribe medications, including prescribing medications with known "Black Box" warnings for increased likelihood of serious and potentially fatal gastrointestinal adverse events, including stomach bleeding, ulcer, and stomach or intestinal perforation;

d.    Improper classification of Ms. Jenkins' and housing reassignment to "mental segregation";

e.     Failure to properly monitor Ms. Jenkins;

f.     Failure to promptly and properly respond to requests for medical treatment for Ms. Jenkins made by jail staff;

g.     Failure to promptly ascertain or treat the serious nature of Ms. Jenkins' medical condition;

h.     Failure to appropriately and timely respond to Ms. Jenkins' serious medical need on August 1 and 2, 2014;

i.     Failure to appropriately and timely respond to and treat Ms. Jenkins' cardiac arrest;

149.   As a direct and proximate result of these actions and/or omissions by these Defendants, Ms. Jenkins suffered severe and permanent physical injuries, resulting in her untimely death.

150.   As a direct proximate result of these Defendants' grossly negligent conduct, Ms. Jenkins' was subject to needless and unusual suffering, pain, mental anguish and incurred medical bills.

151.   As a direct proximate result of these Defendants' grossly negligent conduct, the surviving beneficiaries of Ms. Jenkins' have suffered and will continue to suffer sorrow, mental anguish, loss of companionship, loss of comfort and guidance, medical bills, funeral bills, loss of income and support and other related bills and expenses.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of TEN MILLION DOLLARS ($10,000,000.00), for compensatory damages, together with costs incurred in the pursuit

of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

WHEREFORE, the Defendants' conduct, having been so willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff demands the award of punitive damages against all Defendants, jointly and severally, in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.

A JURY TRIAL IS REQUESTED.

Respectfully Submitted,
VIRGINIA PAIGE JENKINS,
Administratrix of the Estate of
ERIN JENKINS

By: _____
Of Counsel

Jonathan E. Halperin (VSB No. 32698)
Andrew Lucchetti (VSB No. 86631)
Halperin Law Center, LLC
5225 Hickory Park Drive
Suite B
Glen Allen, VA 23059
Phone: (804) 527-0100
Facsimile: (866) 335-1502
jonathan@halperinlegal.com
andrew@halperinlegal.com

Seth R. Carroll (VSB No. 74745)
Matt Lastrapes (VSB No. 84097)
Commonwealth Law Group, LLC
1506 Staples Mill Road
Suite 202
Richmond, VA 23230
Phone: (804) 387-6212
Facsimile: (866) 238-6415
scarroll@hurtinva.com
mlastrapes@hurtinva.com