IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**VIRGINIA PAIGE JENKINS,**
*Administratrix of Estate of Erin Jenkins,*

> **Plaintiff,**

**v.**                                                          **Civil Action No. 3:15cv355**

**SHERIFF C.T. WOODY,** *et al.,*

> **Defendants.**

### MEMORANDUM OPINION

This matter comes before the Court on the following motions:  (1) Defendant Sheriff C.T. Woody's Motion for Summary Judgment, (ECF No. 137); and, (2) Defendant Deputy Elizabeth Beaver's Motion for Summary Judgment, (ECF No. 145).  Sheriff Woody and Deputy Beaver filed the motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]

Plaintiff Virginia Paige Jenkins[2] has responded to both motions for summary judgment, (ECF Nos. 165, 167,[3] 180), and both Sheriff Woody and Deputy Beaver have replied, (ECF Nos. 200, 201).  The Court heard oral argument, and the matter is ripe for disposition.  The Court

---

[1] Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

[2] Because the plaintiff in this matter, Virginia Paige Jenkins, Administratrix of the Estate of Erin Jenkins, has the same last name as Erin Jenkins, the subject of this case, the Court refers to Virginia Paige Jenkins as "Plaintiff" and Erin Jenkins as "Ms. Jenkins" throughout this Memorandum Opinion.

[3] Plaintiff initially filed her response to Sheriff Woody's Motion for Summary Judgment at docket entry 165.  Plaintiff filed a corrected version at docket entry 167.  Plaintiff's exhibits, however, remain filed with docket entry 165.

exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[4] and 1367.[5]  For the reasons that follow, the

Court will grant in part and deny in part the Sheriff Woody Motion for Summary Judgment and

deny the Deputy Beaver Motion for Summary Judgment.

## I. Factual and Procedural Background

### A.    Procedural Background

Plaintiff filed a Complaint against various defendants alleging, on behalf of Ms. Jenkins's

estate, violations of the Fourteenth Amendment,[6] state law negligence, and medical malpractice.

(ECF No. 1.)  After Plaintiff filed her First Amended Complaint, (ECF No. 25), this Court

granted in part and denied in part two motions to dismiss filed separately by Sheriff Woody and

Defendant Correct Care Solutions, LLC ("CCS"), (ECF No. 50).  With leave of court, Plaintiff

filed her Second Amended Complaint.  (ECF No. 51.)  Following an Initial Pretrial Conference,

Plaintiff requested leave to file a third amended complaint, (ECF No. 86), which the Court

---

[4] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  The Third Amended Complaint alleges Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983.  Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law. 42 U.S.C. § 1983.

[5] The Court exercises supplemental jurisdiction over Plaintiff's gross negligence claim pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

[6] The Fourteenth Amendment to the United States Constitution provides, in part:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

2

granted orally at a hearing.  Plaintiff then filed her Third Amended Complaint, adding the

following as party defendants:  Nurse Demetrice Smith, Licensed Clinical Social Worker

("LCSW") Tatjana Jerkovic, Corporal Vivian Hudson-Parham, Lieutenant Johnathan Scott, and

the John Doe(s) responsible for removing Ms. Jenkins from medical observation on August 1,

2014.  (ECF No. 92.)

On July 29, 2016, Plaintiff filed her Motion for Sanctions against Sheriff Woody "for

intentional destruction of relevant evidence, deliberate concealment of relevant evidence and for

deliberate non-compliance with discovery rules."[7]  (Mot. Sanctions 1, ECF No. 112.)  Plaintiff

argues that Sheriff Woody failed to preserve video camera footage taken of Ms. Jenkins's jail

cell which would show the events "leading up to and surrounding [Ms.] Jenkins's death."  (Mem.

Supp. Mot. Sanctions 2, ECF No. 113.)  Sheriff Woody filed a response opposing the requested

sanctions, (ECF No. 114), as did Deputy Beaver, Corporal Hudson-Parham, and Lieutenant

Scott, (ECF No. 116).  Because it had to assess prejudice, the Court reserved ruling on the

Motion for Sanctions until the parties presented their arguments for summary judgment.  The

Court issues a separate opinion regarding sanctions contemporaneous to this one.

On November 30, 2016, upon motion by the parties, the Court dismissed the following

defendants from this action:  Crissy Royall, Aikysha Paige, Demetrice Smith, Khairul Bashar

Mohammed Emran, M.D., and Tatjana Jerkovic.  On December 20, 2016, the Court held a

---

[7] On March 29, 2016, in accordance with the Court's Initial Pretrial Order, the parties
submitted a Joint Stipulation of discovery dispute about the collection of video data at the
Richmond City Justice Center (the "RCJC").  (ECF No. 69.)  Plaintiff alleged that Sheriff
Woody had not "preserved or produced any video data, or data from the video server" in the
RCJC and that the missing data would have shown images from Ms. Jenkins's cell on the night
of her death.  (*Id.* at 6.)

During oral hearing, over Sheriff Woody's objection, the Court allowed Plaintiff to
"obtain a mirror image of the server information" to see if any forensic video image exists of the
events leading up to Erin Jenkins's death."  (Order 2, ECF No. 82.)  After no forensic video
image could be recovered, Plaintiff moved for sanctions.

hearing on the Joint Petition for Approval of a Wrongful Death Settlement filed by Plaintiff and CCS. (ECF No. 126.) The Court approved the wrongful death settlement between Plaintiff and CCS and dismissed CCS from the case. (ECF No. 174.) The Court dismissed Corporal Hudson-Parham and Lieutenant Scott on motion by the parties earlier this month. (ECF No. 218.) Only Sheriff Woody and Deputy Beaver remain as defendants.

The following causes of action against Sheriff Woody and Deputy Beaver, articulated in the Third Amended Complaint, remain:

> **"COUNT I:** § **1983 Defendant Woody – Policy or Custom of Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"**
>
> **"COUNT II:** § **1983 Claim Against Sheriff Woody (Supervisory Liability) – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"**
>
> **"COUNT III:** § **1983 Claim Against Jail Staff[8] – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"**
>
> **"COUNT VI: State Law Claims Against Defendant Sheriff Woody and Jail Staff – Gross Negligence"**

Sheriff Woody moves for summary judgment on Counts I, II, and VI. Deputy Beaver moves for summary judgment on Counts III and VI. Plaintiff opposes summary judgment on all counts.

### B.    Factual Background

This action involves Ms. Jenkins's death while in custody as a pretrial detainee at the RCJC. When the RCJC opened, it was equipped with a new video recording system that included more than 500 cameras covering the jail, inside and out. On August 1, 2014, the night

---

[8] The Third Amended Complaint defines as "Jail Staff" the following individuals: Deputy Beaver, Corporal Hudson-Parham, Lieutenant Scott, and John Doe(s). This Count now pertains only to Deputy Beaver.

before Ms. Jenkins's death, and her last night in the RCJC, cameras were "working and

operational" and recording properly in and around her cell.[9]  (Witham Dep. 82, ECF No 113-2.)

> Sheriff Woody testified that video surveillance in the jail serves many purposes:
>
> Well, live action that can be monitored on certain on—on—on the pods. I can
> come in here and, if an incident happened yesterday or two weeks from now, put
> the date, you put the time in and you can replay the whole thing. And you can use
> it for investigative purposes. You can use it for safety purposes. You can use it
> for people that's—the resident them self [sic] who lies oftenly [sic] about how
> something happened and what happened before.
>
> And so it's a—*sort of a truth serum.* It's been very, very helpful to us
> employment-wise as well as safety-wise and for the residents when they file
> grievances and *just a real live thing of* what's happening, what—*what really
> happened.*

(Woody Dep. 27, ECF No. 113-4 (emphasis added).)  On August 1, 2014, four days into the

RCJC's operations, Ms. Jenkins was found in her cell incoherent, incontinent, and not breathing.

During the five hours before Ms. Jenkins was found incoherent in her isolation cell, the RCJC's

video system recorded all activity there.  Ms. Jenkins was transported from the RCJC to VCU

Medical Hospital, where she died on August 2, 2014.

### 1.    Ms. Jenkins's Detention at the Richmond City Justice Center

Ms. Jenkins entered the RCJC[10] as a pretrial detainee on July 25, 2014, three days

before the RCJC's formal opening.  After CCS[11] performed a medical screening, Ms. Jenkins

---

[9] The video system in the RCJC is programmed to record "when movement is observed. When there's no movement, they don't record."  Recordings from the surveillance cameras were to stay on the server for thirty days, after which the data is overwritten. (Witham Dep. 70–71.) "[W]hen [video surveillance data is] overwritten, it's gone." (*Id.* at 87.)

[10] The Court will set forth the background of the RCJC in greater detail below. *See infra* Section I.B.2.

[11] In his Memorandum of Law in Support of Motion for Summary Judgment, Sheriff Woody mistakenly identifies CCS as "Correct Care Services," rather than Correct Care *Solutions*, LLC. (Mem. Law Supp. Mot. Summ. J. 2, ECF No. 138.) No dispute exists that

was placed on an opiate withdrawal protocol and housed in Section[12] 3C of the RCJC's general population. Upon screening, Ms. Jenkins's medical presentation was healthy. At some point on Wednesday, July 30, 2014, Ms. Jenkins was transferred to Section 3A1, an isolation cell. Section 3A1 is depicted variously in the record as being a medical, mental health, or detox isolation section.

### a. July 30, 2014: Confusion Over Ms. Jenkins's Transfer

The record conflicts as to how Ms. Jenkins's transfer to medical isolation on July 30, 2014 occurred. Deputy Priscilla Wright, who was monitoring Ms. Jenkins's first location, Section 3C, contacted medical. Deputy Wright testified that she wanted to move Ms. Jenkins for Ms. Jenkins's own protection because she was waking people up and they were "getting a little irritated." (Wright Dep. 11, ECF No. 165-8.) Deputy Wright remembered Nurse Yukima Nuttall helping Ms. Jenkins, but also testified that "medical didn't want to move [Ms. Jenkins], so I had to call Classification, Mr. Bassfield also." (*Id.*)

On the other hand, the medical personnel implicated in approving Ms. Jenkins's transfer deny involvement. LCSW Tatjana Jerkovic denies signing an inmate housing form requesting medical isolation for Ms. Jenkins's mental health. Nurse Nuttal also testified that she did not recall speaking to a Sheriff's deputy during that time and that she does not recall examining Jenkins and arranging for a transfer to Section 3A1. Nurse Nutall testified that she would have made notes had she examined Ms. Jenkins. Nurse Nutall also swore that she could not have been involved in "doing housing transfers" because CCS protocol prevented it. (Nutall Dep. 23, ECF

---

Correct Care Solutions, and not a different or related entity, is the medical contractor involved in this case.

[12] The parties do not use consistent nomenclature when referencing separated units of the RCJC. For purposes of consistency, the Court refers to them as "sections."

No. 165-10.) The record lacks any contemporaneous record of Nurse Nutall evaluating Ms. Jenkins prior to the transfer to Section 3A1.

### b.   July 30 and July 31, 2014: Ms. Jenkins's Symptoms Commence

The July 30, 2014 Logbook indicates that, at 4:09 a.m., Corporal Vivian Hudson-Parham[13] brought Ms. Jenkins from Section 3C to Section 3A1 "per Nurse Nutall." (Logbook 8, ECF No. 138-8.) Deputy Beaver[14] had responsibility for monitoring inmates on the third floor, which included Section 3A1, between 7:00 p.m. and 7:00 a.m. At 5:28 a.m., Deputy Beaver noticed Ms. Jenkins "talking to [her]self" and using a "pretend phone." (Logbook 10, ECF No. 138-8.) Two nurses had contact with Jenkins during Deputy Beaver's July 30, 2014 overnight shift: Nurse Maya Vaughn took Ms. Jenkins's blood pressure at 9:20 p.m.; and, Nurse Daniels checked all the third-floor inmates at 11:05 p.m.

Deputy Janet Wilkes-Gaskins relieved Deputy Beaver on Thursday, July 31, 2014, at 7:00 a.m. Deputy Wilkes-Gaskin noted at 7:46 a.m. that "[Ms.] Jenkins did not eat or drink anything." (Logbook 13, ECF No. 138-8.) At 9:01 a.m., Dr. Emran[15] ordered Ms. Jenkins's

---

[13] Corporal Hudson-Parham was the officer in charge of the third floor of the RCJC in July and August 2014. Corporal Hudson-Parham directed Deputy Beaver to call in a second Medical 10-18 because her radio, too, was non-functioning, and medical had not yet arrived. Corporal Hudson Parham confirmed that medical arrived nearly as soon as she sent Deputy Beaver to master control to make a second 10-18 call.

[14] Deputy Beaver worked for the Richmond City Sheriff for more than twenty years. She retired as a deputy in September 2015. As a deputy at the RCJC in July and August 2014, Deputy Beaver's duties included protecting and ensuring the safety and security of inmates. Deputy Beaver was required to make security rounds, check on inmates, and respond to events that arose during her rounds.

[15] Dr. Emran worked for CCS in July and August 2014. He served as the medical director at the RCJC and held the responsibility of providing care for 1,300 inmates. Dr. Emran also supervised physicians and nurses.

transfer from Section 3A1 to Section 2Med.[16]  At 9:30 a.m., Dr. Emran examined Ms. Jenkins, and in a Progress Note, noted a "history of Percocet abuse" and "hallucinating." (Emran Physician's Order of Erin N. Jenkins, ECF Nos. 138-11, 147-6.)  Dr. Emran further noted the physical examination of Ms. Jenkins as "unremarkable." (Emran Progress Note, ECF No. 138-11.)  In testimony, Dr. Emran explained that Ms. Jenkins showed no physical symptoms of withdrawal, but he saw her talking, for a short time, to someone who was not there.  Otherwise, Ms. Jenkins appropriately responded to each examination question.  Dr. Emran testified that Ms. Jenkins's hallucination was not consistent with withdrawal or her medication, and that her physical exam was normal.  Dr. Emran explained that her brief hallucination "did not make sense with her physical examination," so he ordered her kept for observation in Section 2Med.  (Emran Dep. 90, 109, ECF No. 147-2.)  Dr. Emran also ordered the following: (1) that Ms. Jenkins's vitals be taken each shift for the next seven days; (2) that Ms. Jenkins receive Gatorade three times a day; and, (3) that a psychiatrist evaluate Ms. Jenkins.

Nurse Smith[17] remembered that Ms. Jenkins appeared alert and responsive to questions, but also recalled Ms. Jenkins hallucinating.  Specifically, Ms. Jenkins sat up on the bed and said, "Sit your ass down, girl." (Smith Dep. 33, ECF No. 147-7.)  After Dr. Emran asked Ms. Jenkins who she was talking to, she said, "My daughter over there behind the bed." (*Id.*)  Nurse Smith testified that Ms. Jenkins said something about her daughter showing off, but that Ms. Jenkins then "snapped back" and began answering questions appropriately again. (*Id.*)  Nurse Smith had

[16] Sheriff Woody stated that Sergeant Freeman transferred Ms. Jenkins, but the evidence indicates that Freeman only *transported* her.

[17] Nurse Smith is a licensed practical nurse and began working for CCS at the RCJC in 2011.  She worked with Dr. Emran as a "doctor's nurse," and her duties included preparing Dr. Emran's schedule, taking vital signs of patients, and ensuring that Dr. Emran's orders were executed. (Smith Dep. 7, 9–11, ECF No. 147-7.)

the responsibility of carrying out Dr. Emran's order about psychiatric evaluation, but testified that she "did not follow up" on that order because "all she had to do" was "make sure they knew [Ms. Jenkins] needed a psych eval," and she did so.[18] (Smith Dep. 53–54, ECF No. 138-12.) The psychiatrist never evaluated Ms. Jenkins.

On July 31, 2014, and into August 1, 2014, the RCJC housed Ms. Jenkins in Section 2Med with another inmate. Deputy Dwight Gaines was assigned to Section 2Med for the 7:00 a.m. to 7:00 p.m. shift on August 1, 2014, and was responsible for security in the medical office. At about 4:50 p.m., Deputy Gaines received a phone call from Ms. Jenkins's cellmate, who stated that she had been in a fight with Ms. Jenkins. Deputy Gaines visited the cell with Nurse Royall, who assessed Ms. Jenkins. Absent any indication of permission or approval from Dr. Emran, Ms. Jenkins was transferred from Section 2Med to Section 3A1.[19]

Deputy Lakeisha McRae, who assisted Ms. Jenkins during the transfer, saw Ms. Jenkins sit up as if she were smoking a cigarette and driving a car. Deputy McRae testified that Deputy Gaines was in the room when this happened. She also testified that, during the same interaction,

---

[18] A dispute exists about whether Nurse Smith followed up on the psychiatric evaluation. LCSW Jerkovic denies having been notified of any follow-up needs.

[19] Again, a dispute exists as to who ordered Ms. Jenkins's transfer from Section 2Med to Section 3A1. Deputy Gaines suggests that, although he asked if Ms. Jenkins could be relocated so that the residents would not continue fighting, he assumed Nurse Royall had called Classification for the transfer. Commander Burnett, Chief of Jail Operations, testified, consistent with Standard Operating Procedure ("SOP") 249, that only medical personnel may place residents on a medical tier. (Burnett Dep. 66, ECF No. 165-2; Richmond City Sheriff's Office SOP 249, ECF No. 138-2.)

Nurse Royall testified that "Security relocated [Ms. Jenkins]." (Royall Dep. 74, ECF No. 165-13.) Nurse Royall said that security told her that Ms. Jenkins had to be relocated and that she could not have reviewed Ms. Jenkins's medical record because it was electronic and she did not have a computer. Nurse Royall testified that Security does not "usually ask us" if a patient can be relocated. (Id. at 75.) Nurse Smith, whose name appears on the relocation form emailed to classification on August 4, 2014, testified that she never requested that transfer and that she was not on duty at the time the transfer was ordered.

Ms. Jenkins refused to put on her shoes because bugs were on them, despite the fact that no bugs were there. Deputy McRae acted as if she were stomping the bugs to encourage Ms. Jenkins to get dressed so she could be transferred. Deputy Gaines confirmed that he saw Deputy McRae pretend to stomp the imaginary bugs "on [Ms. Jenkins's] shoes or her jumper." (Gaines Dep. 23, ECF No. 138-15.) McRae did not report either of these events to the Deputy on duty in Section 3A1 when transferring Ms. Jenkins.

### c.  August 1, 2014:  Deputy Beaver's Overnight Shift in Section 3A1

Beginning at 7:00 p.m. on August 1, 2014, Deputy Beaver again was assigned to supervise the third floor of the RCJC, including isolation cells and Section 3A1, where Ms. Jenkins was housed. Deputy Beaver stated that when she started her shift, she was told during pass down: "We have somebody in Cell Number 9 back from medical, keep an eye."[20] (March 14, 2016 Beaver Dep. ("Beaver Dep. I") 11, ECF No. 138-20.) Section 3A1 has cameras in each cell.[21] In March 2015, Deputy Beaver testified that, as she started her shift, she did not see Ms. Jenkins throw the food tray but presumed she had "thrown" her food tray and not eaten because she could see the tray under Ms. Jenkins's bed.[22] (Beaver Dep. I 120, ECF No. 147-1.) Deputy

---

[20] Nurse Smith testified separately that she would never transfer someone back and tell the deputy to "keep a special eye" on someone because if a resident needed a "special eye," the resident should be in medical. (Smith Dep. 90–91, ECF No. 165-14.)

[21] Had the video data been retained, its neutral record of Ms. Jenkins's five sentient hours could be placed alongside Deputy Beaver's testimony so that events could be fully evaluated.

[22] Plaintiff rightly points out that Ms. Jenkins's conduct in Section 3A1, and Deputy Beaver's interactions with Ms. Jenkins on August 1, 2014, between 5:00 p.m. and 11:00 p.m. cannot be verified because Sheriff Woody failed to preserve the video camera footage that recorded Ms. Jenkins's detention at the RCJC. Thus, any description of Ms. Jenkins's behavior between 5:00 p.m. and 10:48 p.m. rests entirely on Deputy Beaver's testimony, her statements to the Internal Affairs Division ("IAD"), her Logbook notations, and her multiple versions of the incident report.

Beaver testified that she did not know "what [she] needed to look for in particular as [she] . . . was paying extra attention to [Ms.] Jenkins." (*Id.* at 25–26.)

Deputy Beaver confirmed that, per the Richmond City Sheriff's Office SOPs, she performed nine security checks, twice an hour, between 7:00 p.m. and 10:48 p.m. In each Logbook entry, Deputy Beaver wrote that the security check was "10/4," meaning that she did not see anything unusual. Only a single entry regarding Ms. Jenkins exists in Deputy Beaver's Logbook for those five hours: she lists Ms. Jenkins among the roster in Cell 9 of Section 3A1. Deputy Beaver testified that she entered multiple "10/4"s because none of the behavior she saw Ms. Jenkins exhibit was "unusual" for the Section 3A1 medical/mental/detox isolation tier. (Beaver Dep. I 59, ECF No. 147-1.)

Deputy Beaver also testified to activity not documented in the Logbooks. Deputy Beaver stated that, on August 1, 2014, she was performing additional security checks, but explained that she does not record security checks if she makes extra ones. Deputy Beaver said she turned on the microphone in Ms. Jenkins's cell, conducted security checks every thirty minutes, and observed Ms. Jenkins by camera. Deputy Beaver also indicated that she had voice interactions with Ms. Jenkins several times, during which she asked Ms. Jenkins whether she was okay.

Deputy Beaver saw Ms. Jenkins talking to herself, walking the cell during the evening, using a toilet paper roll like a telephone, and tearing up paper and feeding it through the food

---

Deputy Beaver was deposed twice, and she was interviewed by IAD. While the Court does not have the full transcripts of both depositions, some testimony from the March 14, 2016 deposition differs from that taken on September 14, 2016. For instance, in March, Deputy Beaver testified that she was only told to keep an eye on Ms. Jenkins. However, in September, Deputy Beaver testified that Corporal Hudson-Parham told Deputy Beaver that she had tried to get Ms. Jenkins to calm down and lie back during her shift. (*Compare* Beaver Dep. I 120, ECF No. 147-1, *with* September 14, 2016 Beaver Dep. ("Beaver Dep. II") 16–23, 26, ECF No. 165-24.) Deputy Beaver also testified in her September deposition that she knew that Ms. Jenkins had been placed on her tier because Ms. Jenkins had been acting erratically.

slot, pretending to feed her absent daughter. Rather than calling such behavior "usual," Deputy

Beaver later testified that Ms. Jenkins was acting "like somebody who was on a drug" and "real

weird like." (Beaver Dep. II 12, ECF No. 165-24.) Deputy Beaver confirmed that Ms. Jenkins

never asked her for help; never asked to be taken to the medical department; never asked for

medical assistance; never said she was in pain; never said she was in discomfort; and, never

reported abdominal or stomach pain. Deputy Beaver also stated that she did not call medical to

tell them about Ms. Jenkins's "weird" behavior because when she took over the tier, she had

been told that Ms. Jenkins had "just been put back on there. I made the call when she peed on

herself."[23] (Beaver Dep. II 24, ECF No. 165-24.)

### d.   August 1, 2014: The Moments Immediately Preceding Ms. Jenkins's Collapse

At 10:48 p.m., Deputy Beaver performed a security check. At approximately 10:59 p.m.,

Deputy Beaver observed Ms. Jenkins from the control tower and noticed that she had been seated

on the toilet for a long time. Deputy Beaver testified that Ms. Jenkins sat on the toilet for about

ten to fifteen minutes, but also testified that she "had sat on her toilet for about an hour."

(Beaver Dep. II 13, ECF No. 180-9.) Deputy Beaver visited Ms. Jenkins's cell to ask if she was

okay. Deputy Beaver saw that Ms. Jenkins had urinated and asked her why her sheet was under

the bed. Deputy Beaver received a jumbled response in return. At 10:59 p.m., Deputy Beaver

called Nurse Paige and, without telling her about symptoms other than Ms. Jenkins's

incontinence, asked Nurse Paige to see Ms. Jenkins. Nurse Paige informed Deputy Beaver that

she would be there "as soon as possible." (Richmond City Sheriff's Office Incident Report,

August 2, 2014, ECF No. 138-22.)

---

[23] Deputy Beaver did not record any of this activity in the August 1, 2014 Logbook. Nor does a video of these events exist. It was overwritten.

At some point either just before or just after her call to Nurse Paige, Deputy Beaver observed Ms. Jenkins sit on the bed and lay back. Testifying that she always inspects for "hanging and chest movement," (Beaver Dep. II 13, ECF No. 180-9), Deputy Beaver said she looked again and did not see a rise and fall of Ms. Jenkins's chest. After discovering that her radio battery did not work, Deputy Beaver called a medical emergency by telephone.[24] Corporal Hudson-Parham and Lieutenant Scott[25] then arrived at Ms. Jenkins's cell to assist with the medical emergency. Medical staff showed up immediately thereafter and started CPR. Emergency medical responders eventually revived Ms. Jenkins, and she was transported to VCU Medical Center. Ms. Jenkins suffered a cardiac arrest. Ms. Jenkins's family ultimately removed her from life support, and Ms. Jenkins passed away on August 2, 2014. On October 20, 2014, Medical Examiner Kevin D. Whaley determined the cause of Ms. Jenkins's death to be "Acute Peritonitis Due to Perforated Duodenal Ulcer." (Virginia Department of Health, Office of the Chief Medical Examiner, Dr. Whaley Report of Investigation 1, ECF No. 138-25.)

### 2. Background of the RCJC and Sheriff Woody

Sheriff Woody has served as the elected Sheriff for the City of Richmond since January 1, 2006. He holds responsibility for the operation of the RCJC, which formally opened on July 28, 2014. The RCJC is an air-conditioned correctional facility designed to provide for direct supervision of inmates by staff. The RCJC includes a medical housing unit intended to provide

---

[24] Sheriff Woody produced four versions of an Incident Report by Deputy Beaver describing the 10-18 report that Deputy Beaver called a medical emergency at approximately 11:00 p.m. Two reports demonstrate that Deputy Beaver called a medical emergency at approximately 11:00 p.m., while two reports indicate that she called at 11:04 p.m. (Richmond City Sheriff's Office Incident Reports 1–4, ECF No. 147-13.) Deputy Beaver testified that she added details as to what she saw Jenkins doing and what she said to Jenkins in these reports "due to some confusion." (Beaver Dep. I 101, ECF No. 147-1.)

[25] Lieutenant Scott worked as a shift commander in the RCJC in July and August 2014. He had responsibility for officers under his command and the safety and security of the jail. Approximately 60 to 70 deputies worked under his supervision during a shift.

onsite care to inmates. Inmates requiring additional observation may be placed in an isolated

medical unit equipped with cameras and microphones. SOP 249 provides that only the Chief

Physician or a designee may place residents in the facility's medical and mental health tier.

An independent medical contractor provides all inmate healthcare services at the RCJC,

including medical and mental health services. When the RCJC opened in July 2014, Sheriff

Woody contracted with CCS to provide healthcare services. CCS employed Dr. Emran as the

licensed physician responsible for supervising the RCJC's healthcare services.

### 3.     Department of Corrections Audits

The Department of Corrections (the "DOC") did not audit the RCJC in 2014 because of

the move to the new facility, which DOC had approved. On March 26 and 27, 2013, the DOC

conducted an annual jail inspection of the former Richmond City Jail. The audit found the

former Richmond City Jail 99% compliant with all Life, Health, and Safety Standards.

Specifically, the audit determined that the RCJC:  (1) provided inmate access to medical

services; (2) required First Aid and CPR certification for security staff; and, (3) performed

random twice-per-hour security checks and documented inspections and unusual incidents.

On November 9 and 10, 2015, the DOC conducted its first audit of the RCJC. The DOC

found the RCJC 100% compliant with all standards. The 2015 audit, unlike the one in 2013, left

blank the number of deaths that occurred in the RCJC.

### 4.     Virginia Department of Criminal Justice Services Training Requirements

Under Virginia law, the Department of Criminal Justice Services (the "DCJS") has the

power to "[e]stablish minimum entry-level, in-service, and advanced training standards for

persons employed as deputy sheriffs and jail officers by local criminal justice agencies." Va.

Code § 9.1-102(9). The DCJS mandates 400 hours of Compulsory Minimum Training and 100 hours of field training for certification. 6 VAC 20-20-21.

The DCJS's training for jail officers includes training on rounds, patrols, inspections, security checks, logbooks, observing inmates, preventive patrol techniques, unusual odors and sounds, head counts, and intake and screening. 6 VAC 20-20-50. The DCJS requires deputies to comply with the training standards within twelve months of appointment. 6 VAC 20-50-40. Newly appointed deputies who have not yet attended basic training receive two weeks of "On the Job" training. (Allmon[26] Aff. ¶ 8, ECF No. 138-30.)

All basic, field, and "On the Job" training includes training on how to perform security checks. SOP 202 requires twice-hourly security checks on inmates. Deputies learn to observe each inmate and to check for unusual behavior or signs of illness or injury. SOP 202 requires that deputies, during security checks, look for sickness, injury, assaults, suicides or attempted suicides, and odd or "inappropriate behavior denoting possible mental disorders." (Richmond City Sheriff's Office SOP 202, ECF No. 138-7.) However, nothing in this record lists any training to on how identify "inappropriate behavior denoting possible mental disorders."[27] (*Id.*)

---

[26] Lieutenant Colonel Allmon oversees deputy training at the RCJC.

[27] Paragraph five of Lieutenant Colonel Allmon's affidavit states that DCJS training includes "special populations and abnormal behavior/mental health," but the attached 2014 curriculum for the Basic Training Academy does not include training aimed at "abnormal behavior/mental health." (Basic Training Academy Curriculum, 138-31.) This nine-week curriculum lists four hours devoted to "special populations," four hours to "suicide prevention," two hours to "rounds, patrols, and inspections," and two hours to "record keeping." Even given the three days of training for "Direct Supervision," when drawing inferences favorably to Ms. Jenkins, this Court cannot infer that abnormal behavior/mental health was taught during Basic Training Academy. Nor can it draw inferences as to the content of training without any examples of materials. Finally, the relevance of this document to Deputy Beaver's training is attenuated at best. Deputy Beaver would have attended Basic Training in 1994, twenty years earlier.
Moreover, the topics of cultural diversity, legal training, and career development/elective training mandated every two years also do not support a finding that abnormal behavior/mental

Physical, suicidal, and emergent events do appear to be taught. For example, if an inmate appears to be sleeping, deputies are trained to observe the rise and fall of the chest and to look for other bodily movements. If no movement is observed, deputies are trained to make verbal contact or other audio techniques. If an inmate remains unresponsive, deputies are trained to seek medical assistance by giving a "10-18" signal, indicating a medical emergency. Deputies also receive annual First Aid/CPR/AED training.[28]

At some point prior to the opening of the RCJC, all deputies were provided access to policy handbooks for the new facility, which the deputies were expected to study and learn. The deputies also took tours and received on-site training for supervision of all inmate populations, including training on proper responses to medical and safety incidents. However, while the attached PowerPoint presentation of that training includes some "slides" on how to respond to medical emergencies, it includes no training, or mention, of observing an inmate's mental health during observation or rounds. Nor does it specify what might be a "noteworthy event or incident" that it suggests would be worth recording in a "Log Book." (City of Richmond Justice Center Pod Familiarization Training, ECF No. 138-36.) Regarding her own RCJC training, Deputy Beaver confirmed only that she was taken to a computer and shown how to use the video

---

health training occurs. None of the course descriptions attached to Lieutenant Colonel Allmon's affidavit involve medical or mental health training.

[28] These training programs seem to align with SOP 250, which sets forth the RCJC's policy for providing "Medical/Mental Health care." (Richmond City Sheriff's Office SOP 250, ECF No. 201-2.) Despite its moniker, SOP 250 does not delineate any training about mental health, providing only the following information: (1) the Chief Physician provides necessary mental health services; (2) mental health records shall not be provided to an inmate if it would be injurious to the inmate's well-being; (3) only the Chief Physician may designate an inmate for the mental health tier; (4) inmates in isolation cells must be observed every fifteen minutes; (5) suspected suicidal inmates must wear paper garments instead of clothing items; and, (6) no mental health/suicidal resident shall be placed in an isolation cell without notification to a listed supervisor.

16

observation system, including manipulating the cameras by zooming in and out, and turning the audio system on and off.   The record is bereft of any other training Deputy Beaver received.

Section 3A1, where Deputy Beaver worked and Ms. Jenkins was housed, is described at various places throughout the record as a medical, mental health, or detox isolation unit.  For instance, Colonel Burnett testified that Section 3A1 is a medical or mental health pod "where they may deem that you may have mental health issues which would require you to be locked in more closely" with individual cells and cameras in each cell.  (Burnett Dep. 84, ECF No. 165-2; *see also* Royall Dep. 76, ECF No. 138-17 (describing 3A1 and as mental health and detox observation area).)  However, the record indicates that the deputies assigned to Section 3A1 did not receive any special training and, like other deputies, they never received instruction on proper observation to know when to report to medical staff inmates who are experiencing symptoms that could be caused by either a psychological or physiological condition.

First, citing Lieutenant Colonel Allmon as the expert on training, Sheriff Woody testified that he did not know what kind of training the Sherriff Office's employees would receive "with respect to the recognition of issues that need to be sent to medical for evaluation."  (Woody Dep. 64, ECF No. 165-3.)  According to Colonel Burnett, any deputy can be placed in Section 3A1, and all deputies are trained "the same way"; deputies receive no different training or require specific qualifications to serve on a mental health, medical tier.  (Burnett Dep. 30, ECF No. 165-2.)  Deputy Beaver testified that Section 3A2 houses inmates in isolation for discipline issues and that deputies do nothing different when observing the two sides.  Lieutenant Scott, without citing a SOP or other training document, confirmed that, on Section 3A1, talking to someone "who is not there" would not be unusual and that a deputy need not report such behavior to medical unless an inmate is a hazard to herself or the cell.  (Scott Dep. 78–79, ECF No. 147-2.)  Deputy

17

Beaver testified that Ms. Jenkins's behavior on August 1, 2014, was not unusual for Section 3A1, but that she did not know "what [she] needed to look for in particular as [she] . . . was paying extra attention to [Ms.] Jenkins." (*Id.* at 25–26.)   Also without identifying a policy, Lieutenant Scott indicated that if someone were hallucinating for five to ten minutes, he might call medical personnel.

When CCS offered, Sheriff Woody declined to have CCS "educate security staff on pertinent medical issues," including:  "Emergency response"; "Symptom recognition"; "Treatment recognition"; "Recognizing signs and symptoms of mental illness"; "Urgent and emergent medical conditions"; and "Signs and symptoms of chemical dependency." (CCS Proposed Jail Staff Training Program, ECF No. 165-4; *see also* Sheriff Woody Dep. 66, ECF No. 165-3.) Sheriff Woody testified that he did not want medical people to train his guards because "the medical people [are] the experts." (Woody Dep. 66, ECF No. 165-3.)  Sheriff Woody said: "We have a standard that is required by the Department of Criminal Justice Services.  And as long as we are meeting that standard and passing it on a yearly basis, that's all we're required to do." (*Id.*)

## II.  Analysis:  Motions for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  "A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 WL3653878, *4 (E.D. Va. June 30, 2016) (citing *Liberty Lobby*, 477 U.S. at 248).  Once a

party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50.

### B. Sheriff Woody's Motion for Summary Judgment

Sheriff Woody moves for summary judgment on three counts: "Count I: § 1983 Defendant Woody – Policy or Custom of Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"; "Count II: § 1983 Claim Against Sheriff Woody (Supervisory Liability) – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"; and, "Count VI: State Law Claims Against Defendant Sheriff Woody and Jail Staff – Gross Negligence." For the reasons that follow, the Court will deny Sheriff

Woody's Motion for Summary Judgment as to Counts I and IV and grant Sheriff Woody's

Motion for Summary Judgment as to Count II.

### 1.   Section 1983 Liability Against Sheriff Woody

Plaintiff brings her Fourteenth Amendment claims[29] against Sheriff Woody (Counts I

and II) under 42 U.S.C. § 1983, which provides a private right of action for a violation of

constitutional rights by persons acting under the color of state law. "Section 1983 . . . 'is not

itself a source of substantive rights, but merely provides a method for vindicating federal rights

elsewhere conferred' . . . . Hence, to establish liability under Section 1983, a plaintiff must show

that the defendant, acting under color of law, violated the plaintiff's federal constitutional or

statutory rights, and thereby caused the complained of injury." *Brown v. Mitchell*, 308 F. Supp.

2d 682, 692 (E.D. Va. 2004) ("*Mitchell I*") (citations omitted).

The Due Process Clause of the Fourteenth Amendment "mandates the provision of

medical care to detainees who require it." *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001)

(citation omitted); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998). Thus,

when evaluating the constitutionality of a pre-trial detainee's claim, the Court must determine

whether the government acted in a deliberately indifferent manner to the detainee's serious

medical needs. *Harris*, 240 F.3d at 388. The Court will address Counts I and II in turn.

---

[29] Sheriff Woody references Plaintiff's § 1983 claims as seeking redress under the Eighth Amendment. However, because Ms. Jenkins was a pretrial detainee, her § 1983 claims arise under the Fourteenth Amendment. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("[I]f Brown was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to detainees who require it.'" (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)).

### 2. The Court Will Grant Sheriff Woody Summary Judgment on One of Plaintiff's Two § 1983 Municipal Liability Claims

The Court will grant in part Sheriff Woody's Motion for Summary Judgment on

Plaintiff's Count I, which alleges a § 1983 claim against Sheriff Woody under a theory of

municipal liability. When a plaintiff brings a § 1983 claim against a municipality,[30] liability

attaches only if "an official policy or custom" caused the "unconstitutional deprivation of the

plaintiff's rights." *Mitchell I*, 308 F. Supp. 2d at 692 (citing *Monell v. Dep't of Soc. Servs. of*

*N.Y.*, 436 U.S. 658, 694 (1978)).

> A policy or custom for which a [Sheriff] may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or[,] (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217

(4th Cir. 1999)). Plaintiff frames her deliberate indifference claim against Sheriff Woody under

two (related) theories: (1) Sheriff Woody has an affirmative policy or custom that dictates that

neither he nor his staff is responsible for recognizing and responding to the serious medical

needs of inmates at the RCJC; and, (2) Sheriff Woody failed to train his subordinates in

observing and reporting serious medical needs of inmates at the RCJC.[31] The Court will grant

Sheriff Woody summary judgment on the first theory, but deny it on the second.[32]

---

[30] *See Lloyd v. Morgan*, No. 4:14cv107, 2015 WL 1288346, at *6 (E.D. Va. Mar. 20, 2015) ("[A] [s]heriff can be 'liable under Section 1983 if [he or she] causes such a deprivation through an official policy or custom.'" (quoting *Francis v. Woody*, No. 3:09cv325, 2009 WL 1442015, at *5–6 (E.D. Va. May 22, 2009)).

[31] At oral argument, in response to questioning from the Court, Plaintiff clarified that her failure-to-train claim rests on a more specific theory of liability than that which she briefed. In what amounted to a narrowing of her claim, Plaintiff explained that the deficiency in Sheriff Woody's training program was his failure to train jail staff on proper observation to know when

**a.    The Court Will Grant Sheriff Woody Summary Judgment on Plaintiff's § 1983 Claim of a Policy or Custom of Deliberate Indifference That Caused Ms. Jenkins's Constitutional Injury**

The Court will grant Sheriff Woody summary judgment on Plaintiff's Fourteenth Amendment claim that Sheriff Woody implemented an "affirmative" policy or custom of deliberate indifference that caused Ms. Jenkins's constitutional injury.[33] In broad fashion, Plaintiff argues that Sheriff Woody has a policy or custom of deliberate indifference to the medical needs of inmates at the RCJC because he "has *an affirmative policy or custom* which dictates that *neither he nor his staff [is] responsible for recognizing and responding to the serious medical needs of inmates*." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 13, ECF No. 167 (emphasis added).) Plaintiff suggests that Sheriff Woody "denies that he is responsible for ensuring that medical treatment is not withheld for the serious medical needs of inmates at the" RCJC. (*Id.*) Plaintiff contends that Sheriff "Woody attempts to shift all responsibility for medical care, or lack thereof, onto his medical contractor(s)."[34] (*Id.*) Plaintiff does not provide evidence demonstrating how such an expansive policy, should it exist, caused Ms. Jenkins's injury.

---

to report to medical staff inmates who are experiencing symptoms that could be caused by either a psychological or physiological condition. *See infra* Section II.B.2.b.ii. Plaintiff noted that jail staff make decisions about inmates not only when they report the inmates' symptoms to medical personnel, but also when they do not. Plaintiff argued that Sheriff Woody should not be permitted to leave to his subordinates decisions they are not trained to make.

[32] Sheriff Woody also requested summary judgment on the presumption that Plaintiff pursues a deliberate indifference claim under a failure-to-investigate theory. Plaintiff did not brief this theory of liability and, at oral argument, confirmed that she would not pursue it.

[33] "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

[34] Sheriff Woody testified that he is not "at all responsible for the medical care that the inmates [at RCJC] receive." (Woody Dep. 153, ECF No. 165-3.) When asked "[w]ho is responsible," Sheriff Woody responded: "The medical department." (*Id.*)

22

To recover under a theory of municipal liability, "a 'plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)). The United States Court of Appeals for the Fourth Circuit has explained that "municipal liability will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" *Id.* at 218 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)). "The challenged policy or custom cannot merely be the abstract one of violating citizens' constitutional rights."[35] *Id.* Under these precepts, Plaintiff must provide evidence demonstrating a "close fit" between Sheriff Woody's purported policy of shifting the responsibility to provide medical care and the particular constitutional right Sheriff Woody allegedly violated: the actual failure to provide medical care to Ms. Jenkins. Plaintiff provides no evidence to this point.

Plaintiff, however, in an effort to establish a causal link, tries to attribute wide-ranging consequences to Sheriff Woody's alleged decision to deny medical care. Plaintiff invokes heated rhetoric and inadmissible news reports to claim "the death rate at the [City Jail] has been among the highest during [Sheriff Woody's] tenure" and that, even following the construction of the RCJC, "the body count under [Sheriff] Woody's watch continues to define his jail as one of the deadliest in America." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 14–15.) According to Plaintiff, "[t]his is a *direct result* of the constant factor throughout this period: [Sheriff]

---

[35] "[B]y requiring litigants to identify the offending municipal policy with precision, courts can prevent trials from straying off into collateral accusations of marginally related incidents." *Carter*, 164 F.3d at 218.

Woody's unconstitutional mentality that he and his staff are not responsible for the medical care

of inmates at the" RCJC.[36]  (*Id.* at 15 (emphasis added).)

While the number of deaths at the Richmond City Jail and the RCJC has been well

documented, those circumstances—without more—cannot sufficiently undergird Plaintiff's

claim to raise a constitutional claim here.[37] Fatal to Plaintiff's argument, "a plaintiff cannot rely

upon scattershot accusations of unrelated constitutional violations to prove either that a

municipality was indifferent to the risk of her specific injury or that it was the moving force

behind her deprivation."[38] *Carter*, 164 F.3d at 218; *see also Milligan v. City of Newport News*,

743 F.2d 227, 230 (4th Cir. 1984) ("[L]iability may not be rested simply upon a failure to adopt

policies that in retrospect can be seen to be a means by which [a] particular [constitutional

deprivation] . . . might have been averted."). The Court will grant Sheriff Woody's Motion for

---

[36] Of course, the law differentiates between a "mentality" of indifference and an "affirmative policy or custom" amounting to deliberate indifference.

[37] Although Plaintiff does not advance in her summary judgment briefing a theory of deliberate indifference arising out of *specific* deaths that have happened at the RCJC or during Sheriff Woody's tenure, the Court takes note of cases brought by two inmates, and raised in briefing on the Motion for Sanctions, who died in custody under similar circumstances to Ms. Jenkins. First, less than four months before Ms. Jenkins's death, Michael Cosby died in custody at the Richmond City Jail from peritonitis caused by a perforated duodenal ulcer. Prior to his death, Cosby had allegedly told jail and/or medical staff that he took heroin daily. Even though he complained of abdominal pain days before and had an elevated pulse, Cosby was not monitored. Second, Grant Sleeper, an inmate suffering from schizophrenia, died from heat exhaustion. Sleeper's allegations noted that jail and/or medical staff placed him in the jail's common population in spite of his apparent medical needs, at least in part because the staff presumed Sleeper's symptoms were caused by detoxing. The Court mentions these cases knowing the limited evidentiary value, if any, of looking toward accusations only.

[38] To the extent Plaintiff contends that Sheriff Woody's decision to hire a private contractor (CCS) constitutes, by itself, deliberate indifference to the medical needs of inmates at the RCJC, her claim fails. While contracting out medical care at the RCJC does not relieve Sheriff Woody of his constitutional duty to provide adequate medical treatment, *see West v. Atkins*, 487 U.S. 42 (1988), neither does contracting out medical care demonstrate deliberate indifference. Sheriff Woody does not face constitutional liability simply because he contracted with CCS to provide medical care.

Summary Judgment on Plaintiff's Count I to the extent it alleges that Sheriff Woody caused Ms.

Jenkins's injury through an affirmative policy or custom dictating that neither he nor his staff is

responsible for recognizing and responding to the serious medical needs of inmates at the RCJC.

> **b.  The Court Will Deny Sheriff Woody Summary Judgment on Plaintiff's § 1983 Claim for Failure to Train**

As to Plaintiff's second theory, the Court must find that Plaintiff raises a jury issue

regarding failure to train.  In order to survive Sheriff Woody's Motion for Summary Judgment

on her failure-to-train theory, Plaintiff "must raise a triable issue of fact that: (1) [Sheriff]

Woody's subordinates actually violated [Ms. Jenkins]'s constitutional rights; (2) that [Sheriff]

Woody failed to properly train his subordinates, thus illustrating a deliberate indifference to the

rights of the persons with whom the subordinates come into contact; and[,] . . . (3) [that] this

failure to train actually caused the subordinates to violate [Ms. Jenkins]'s rights." *Woodson v.*

*City of Richmond*, 88 F. Supp. 3d 551, 570 (E.D. Va. 2015) (citing *City of Canton v. Harris*, 489

U.S. 378, 388–89 (1989); *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000)).

> **i.  Plaintiff Presents Evidence That Sheriff Woody's Subordinates Violated Ms. Jenkins's Constitutional Rights**

To establish the first element, Plaintiff must raise a triable issue of fact establishing that

Sheriff Woody's subordinates actually violated Ms. Jenkins's Fourteenth Amendment right.

*Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001).  Plaintiff argues that Ms. Jenkins

suffered a violation of her Fourteenth Amendment right to the provision of medical care when

deputies and security staff failed to secure medical attention for her when her condition

deteriorated on August 1, 2014.

To establish that Sheriff Woody's subordinates violated Ms. Jenkins's Fourteenth

Amendment right, Plaintiff must show that the deputies and security staff were "deliberately

indifferent to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

"Specifically, the plaintiff asserting this type of [Fourteenth] Amendment claim must show that: (1) objectively[,] the medical need was serious; and (2) subjectively[,] the [subordinates] acted with a sufficiently culpable state of mind, that is, they failed to act in the face of a subjectively known risk." *Brown v. Mitchell*, 327 F. Supp. 2d 615, 651 (E.D. Va. 2004) ("*Mitchell II*").

No party materially disputes that Ms. Jenkins suffered a perforated duodenal ulcer, which the Court concludes is an objectively serious medical condition for which Ms. Jenkins did not receive treatment.[39] *See Deck v. Rubenstein*, No. 1:15cv159, 2016 WL 2726543, at *5 (N.D. W. Va. Apr. 13, 2016) (citing *Victoria W. v. Larpenter*, 205 F. Supp. 2d 580, 600–01 (E.D. La. 2002) (recognizing that other courts have found "serious medical needs" in herniated discs, broken jaws, life-threatening ulcers, risk of suicides, and heart attacks)).[40] Thus, whether

---

[39] Deputy Beaver, nonetheless, suggests that the perforated duodenal ulcer does not constitute a "serious medical need" because Dr. Emran allegedly failed to diagnose it as a condition mandating treatment when he saw Ms. Jenkins at 9:30 that morning. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) ("[A] 'serious . . . medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

First, Deputy Beaver fails to address whether the passage of time and Ms. Jenkins's transfer off the medical tier would affect that analysis. Second, even if Dr. Emran failed to diagnose Ms. Jenkins's condition, which the Court need not find, Plaintiff has proffered expert testimony in support of her theory that the perforation of Ms. Jenkins's duodenal ulcer started the causal chain that resulted in Ms. Jenkins's death. At a minimum, a genuine dispute exists as to whether Ms. Jenkins's perforated duodenal ulcer caused her death. Viewing this dispute in Plaintiff's favor, as the Court must, the record on summary judgment establishes that Ms. Jenkins suffered from an objectively serious medical condition. *See Iko*, 535 F.3d at 241 (rejecting argument that decedent, who "did not appear fazed by the pepper spray," did not suffer from a serious medical condition because "the state's own medical examiner credited the pepper spray as contributing to [the decedent's] death of asphyxia").

[40] Plaintiff additionally posits that Ms. Jenkins had a "serious medical need" in the form of her hallucinations. Ms. Jenkins's hallucinations, however, reflected a *symptom* of the medical need that allegedly caused her death, *i.e.*, her perforated duodenal ulcer. The Court declines to view Ms. Jenkins's medical condition, and a symptom purportedly caused by it, under separate

Sheriff Woody's subordinates violated Ms. Jenkins's Fourteenth Amendment right turns on whether they failed to act in the face of a *subjectively-known* risk.

As to a subjectively-known risk,[41] Plaintiff proffers evidence that Sheriff Woody's subordinates observed and knew that Ms. Jenkins exhibited a series of notable symptoms. On July 30, 2014, Deputy Beaver witnessed Ms. Jenkins speaking on a pretend phone, and the next morning, Deputy Janet Wilkes-Gaskins noted that Ms. Jenkins had not eaten anything. Jenkins was transferred to Section 2Med, where Deputy McRae and Deputy Gaines saw Ms. Jenkins speak to persons not there and react to non-existent bugs that she appeared to hallucinate.[42] Ms. Jenkins's transfer from Section 2Med to Section 3A1 occurred, but yet another question exists as to who effectuated this transfer.[43]

---

theories of liability. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his [or her] 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his [or her] medical condition.").

[41] Deliberate indifference requires both that the defendant "subjectively recognized a substantial risk of harm" and "that his [or her] actions were 'inappropriate in light of the risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal citation omitted). A mere "error of judgment [or] inadvertent failure to provide adequate medical care . . . [does] not constitute a constitutional deprivation redressable under § 1983." *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979). Negligence is not deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

[42] Dr. Emram's notes recorded the hallucination and ordered observation and a psychological evaluation. Because the medical department does not supervise deputies, the Sheriff's deputies cannot be held responsible for failing to carry out the doctor's orders. However, neither Deputy Gaines nor Deputy McRae made note of the hallucinations, nor does the record show they told any other deputy or doctor about Ms. Jenkins's behavior.

[43] The Court has yet to rule on Sheriff Woody's pending Motion *in Limine*, (ECF No, 160), but a jury likely should decide whether a deputy, Gaines, improperly effectuated the transfer of Ms. Jenkins out of the medical tier on the afternoon of July 31, 2014, or whether a nurse, either Smith or Royall, did so according to protocol. While Sheriff Woody argues that the

But it is especially through Deputy Beaver's testimony that plaintiff raises a jury question as to a subjectively-known risk. First, Deputy Beaver testified that, during the five-hour period in which she recorded a total of nine "10/4's" in her logbook, she saw and heard Ms. Jenkins— without documenting any "incidents or noteworthy facts [] deemed vital [for the] relieving deputy"[44]—do the following: (1) fail to eat by throwing her tray; (2) toss her sheet under her bed; (3) behave "real weird" and like someone under the influence of drugs; (4) talk to someone on an imaginary paper phone; (5) push paper through a slot to "feed" her imaginary daughter; (6) sometimes speak incoherently; (7) pace around her cell restlessly; and, (8) sit on her toilet for either ten to fifteen minutes, or for an hour. Deputy Beaver testified that she was told to keep an eye on Ms. Jenkins, but later expanded that testimony to suggest she knew that Ms. Jenkins had acted erratically on another tier. Deputy Beaver testified that she added details as to what she saw Ms. Jenkins doing and what she said to Ms. Jenkins in each subsequent version of the Incident Report "due to some confusion." (Beaver Dep. I 101, ECF No. 147-1.) Deputy Beaver also appears to contradict herself about the timing and duration of certain events. In spite of

---

dispute as to who made the transfer decision is irrelevant to Plaintiff's claims against Sheriff Woody, the Court is inclined to disagree.

Independent of any argument by Plaintiff about whether Ms. Jenkins may have survived had she remained on the medical tier, Plaintiff should be allowed to challenge any of Sheriff Woody's contentions that he sufficiently trained deputies on medical matters, including transfers. While the conflicting evidence may be prejudicial, it likely would not be so prejudicial as to substantially outweigh any probative value, or inflame the jury. The fact that a different medical provider, LCSW Jerkovic, denies signing documents approving Ms. Jenkins's earlier July 30, 2014, 4:09 a.m. transfer from Section 3C to Section 3A1 suggests further that the jury should be allowed to weigh the impact, if any, of the conflicting record as to how transfers of Ms. Jenkins transpired.

[44] *See* City of Richmond Justice Center Pod Familiarization Training, "Log Books." (Witham Aff., ¶ 4, Ex. 138-36.) The Court notes that it has not ruled on Sheriff Woody's Motion *in Limine*, (ECF No. 160), to preclude introduction of internal policies and procedures. The Court will reserve whether such evidence might be permitted, or how, at trial.

On summary judgment, however, Woody cites his own SOPs and training documents to buttress his claim of adequate training. The Court therefore cites them in that context only.

these observations, Sheriff Woody seeks summary judgment on the basis that Deputy Beaver did not act with deliberate indifference to Ms. Jenkins's serious medical needs by deferring contact with medical personnel until Ms. Jenkins "peed on herself" because it was only that moment that evinced changed behavior warranting a report to medical.

On the record before the Court, Sheriff Woody's position cannot be countenanced. Although Deputy Beaver played no role in its disappearance, and without making any finding on Deputy Beaver's credibility, the absence of the video recording of Ms. Jenkins's movements and demeanor for the crucial five hours before her demise creates an issue for the jury to weigh alongside Deputy Beaver's testimony and any relevant RCJC records.[45] Whether Sheriff Woody's subordinates deny actual knowledge of Ms. Jenkins's medical condition is of no moment.[46] Their knowledge can be demonstrated "in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### ii.    Plaintiff Presents Evidence That Sheriff Woody Failed to Properly Train His Subordinates

To satisfy the second element, "a plaintiff must point to specific training deficiencies, and show either that an inadequately trained employee engaged in a pattern of unconstitutional conduct *or* that a violation of a federal right is a 'highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Woodson*, 88 F. Supp. 3d at 571 (emphasis added) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,

---

[45] At trial, the jury will be told that the video is missing, and the parties will present to the jury evidence and argument regarding the missing video. The jury will be allowed to consider that evidence, along with all the other evidence, when deliberating.

[46] The Court recognizes that the fact that someone sent Ms. Jenkins back to Section 3A1 from Section 2Med weighs in favor of an argument that Deputy Beaver did not subjectively believe that Ms. Jenkins's condition posed a risk. Regardless, this determination remains a question for the jury to resolve given the absence of a video record of Ms. Jenkins's behavior in her cell in Section 3A1.

520 U.S. 397, 407–09 (1997)).  Ordinarily, "[a] pattern of similar constitutional violations by

untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure

to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  "Without notice that a course of

training is deficient in a particular respect, decisionmakers can hardly be said to have

deliberately chosen a training program that will cause violations of constitutional rights." *Id.*  A

pattern of violations puts decisionmakers on notice of the need for new training, and "[t]heir

continued adherence to an approach that they know or should know has failed to prevent tortious

conduct by employees may establish the conscious disregard for the consequences of their

action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bryan Cty.*, 520

U.S. at 407.

In *City of Canton v. Harris*, however, the Supreme Court found that in certain situations,

the need for training "can be said to be 'so obvious,' that failure to [train] could properly be

characterized as 'deliberate indifference' to constitutional rights" even in the absence of a pattern

of constitutional violations.[47]  489 U.S. 378, 390 n.10 (1989).  Such obvious failure-to-train

---

[47] At oral argument, Sheriff Woody's counsel argued that a failure-to-train claim cannot
stand absent notice in the form of a pattern of violations.  In support of this premise, counsel
cited Justice O'Connor's opinion—concurring in part and dissenting in part—in *Canton*.  There,
Justice O'Connor explained: "Without some form of notice to the city, and the opportunity to
conform to constitutional dictates both what it does and what it chooses not to do, the failure to
train theory of liability could completely engulf *Monell*, imposing liability without regard to
fault."  489 U.S. at 395.

Cherry picking this language slightly out of context resulted in counsel's failure to
acknowledge that deliberate indifference may also be found, functionally without notice, when
"the need for more or different training is so obvious, and the inadequacy so likely to result in
the violation of constitutional rights, that the policymakers of the city can reasonably be said to
have been deliberately indifferent to the need." *Id.* at 390.  Even Justice O'Connor agrees. *See
id.* (O'Connor, J., concurring in part, dissenting in part) ("I . . . agree that where municipal
policymakers are confronted with *an obvious need to train city personnel to avoid the violation
of constitutional rights* and they are deliberately indifferent to that need, the lack of necessary
training may be appropriately considered a city 'policy' subjecting the city itself to liability
under our decision in *Monell* . . . ." (emphasis added)).

events might include "the need to train officers in the constitutional limitations on the use of deadly force" because municipal decisionmakers know that their police officers will be required to arrest fleeing felons. *Id.* Liability in single-incident cases depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[48] *Bryan Cty.*, 520 U.S. at 409.

While, at times, Plaintiff frames it in broader terms, the Court interprets Plaintiff's failure-to-train theory as resting on the premise that Sheriff Woody failed to train his subordinates about how to observe inmates so they may know when to report to medical staff inmates experiencing symptoms that could be caused by either a psychological or physiological condition.[49] In response, Sheriff Woody cites, as a substitute for evidence in this case, two previous decisions in this Court, which he argues confirm that his reliance on training mandated

---

[48] In *Connick*, the Supreme Court examined the applicability of single-incident liability. There, an exonerated convict sued the New Orleans District Attorney for failing to train prosecutors on discovery disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). 563 U.S. 51. The Supreme Court determined that the failure to train did not "fall within the narrow range of *Canton*'s hypothesized single-incident liability" in light of the prosecutors' legal training and professional obligations, which differentiated them from other public employees, such as police officers or prison guards. *Id.* at 64. Unlike armed police officers who "must sometimes make split-second decisions with life-or-death consequences" and have no reason to be "familiar with the constitutional constraints on the use of deadly force," *id.*, "[p]rosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain," *id.* at 66–67. Thus, the Supreme Court reasoned, "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 67 (quoting *Bryan Cty.*, 520 U.S. at 409).

[49] Unlike in *Connick*, the need for training in this case was obvious. Common sense dictates that the failure to report to medical staff inmates experiencing symptoms that could be caused by either psychological *or* physiological conditions would result in the denial of medical care to, and sometimes a failure to treat the serious medical needs of, those detainees. In the face of such a "highly predictable consequence," Plaintiff need not show evidence "that an inadequately trained employee engaged in a pattern of unconstitutional conduct." *Woodson*, 88 F. Supp. at 571. That said, Sheriff Woody himself has witnessed the consequences of misdiagnosed medical conditions. *See supra* p. 24 n.37 (discussing deaths involving circumstances similar to Ms. Jenkins's case).

by the DCJS established proper training of his subordinates in 2014. (Sheriff Woody Mem. Law Supp. Mot. Summ. J. 18 (citing *Woodson*, 88 F. Supp. at 572–73); *see also* Sheriff Woody Reply 4, ECF No. 200.) Sheriff Woody implies, absent legal precedent, that compliance with Virginia DOC standards shields him from liability. In all respects, his arguments fail.

First, Sheriff Woody cannot casually import into this record findings from a twelve-year-old case against a different sheriff at the former jail involving an inmate death from bacterial meningitis. *See Mitchell II*, 327 F. Supp. 2d 615. In *Mitchell II*, the Honorable Robert E. Payne, United States District Judge, found that Sheriff Mitchell established a "[j]ail-related training program" that "consist[ed] of three major components: (1) on the job training with Field Training Officers; (2) classes at the Richmond in-house training academy; and[,] (3) periodic in-service ongoing educational training for deputies." *Id.* at 653. Noting that Sheriff Mitchell produced detailed evidence about her specific training program that met the DCJS requirements, Judge Payne found Sheriff Mitchell's 2004 training system to be comprehensive, state approved, and adequate to meet inmates' medical needs. *Id* at 652–53. The *Mitchell II* Court made its finding, however, relying on an affidavit from the sheriff's captain, to which he attached "a copy of the study materials" used to train deputies, which included discussion of the "methods deputies must employ to recognize sick and injured inmates," and those that taught guards "how to recognize the symptoms of infectious and communicable diseases in general." *Id.* at 653. The record before this Court lacks any such detailed training records.

Second, in *Woodson*, a case from the former jail involving severe injury from heat exhaustion, Judge Payne concluded that DCJS "training educated deputies on how to procedurally supervise inmates' health, told them what signs to look for if an inmate was in distress, and mandated that they call the medical department if confronted with an emergency."

*Woodson*, 88 F. Supp. 3d at 572. Judge Payne noted "that deputies did receive 30 minutes of

training specifically in relation to heat-related injuries, 8 hours of first aid training as a whole,

and extended training on how to spot and respond to medical issues in the [j]ail." *Id.* at 572.

Accordingly, Judge Payne held that "[n]o reasonable jury could find that such training had

specific deficiencies related to heat-caused illnesses such that it created a situation in which a

constitutional violation was a 'highly predictable consequence.'" *Id.* at 572–73.

　　Contrary to the record in *Woodson*, evidence here shows that Sheriff Woody's

subordinates *did not* receive *any* training on the particular issue at stake—how to observe and

report to medical staff inmates experiencing symptoms that could be caused by either a

psychological or physiological condition—nor did Sheriff Woody offer such training.[50]

(Colonel Burnett Dep. 30, ECF No. 165-2.)  Moreover, Sheriff Woody declined CCS's offer to

"educate security staff on pertinent medical issues," including:  "Emergency response";

"Symptom recognition"; "Treatment recognition"; "Recognizing signs and symptoms of mental

illness"; "Urgent and emergent medical conditions"; and "Signs and symptoms of chemical

dependency." (CCS Proposed Jail Staff Training Program, ECF No. 165-4; *see also* Sheriff

Woody Dep. 66, ECF No. 165-3.)[51]

---

[50] SOP 250 purports to indicate that RCJC has some policies regarding mental health—specifically, suicide prevention.  SOP 250, however, does not suggest any training relevant to Plaintiff's claim. *See supra* p.16 n.28.

[51] At oral argument, Plaintiff proffered evidence that no training had been provided to subordinates about proper observation to know when to report to medical staff inmates experiencing symptoms that could be caused by either a psychological or physiological condition.  Although Plaintiff appeared to have met her burden of demonstrating a triable issue, the Court asked Sheriff Woody if he could proffer *any* evidence to the contrary.  Sheriff Woody's counsel could not and, instead, argued that the determination of whether Jenkins suffered from a mental or physiological condition was for the medical department to decide, and not Sheriff Woody's deputies.  Sheriff Woody's argument misses the mark.
Plaintiff's failure-to-train theory rests on the premise that Sheriff Woody's deputies did not have training about when to report to medical staff inmates who are experiencing symptoms

Especially because inferences must be taken in favor of the non-movant Plaintiff, the

Court finds that a jury could conclude that training of deputies concerning proper observation to

know when to report to medical staff inmates experiencing symptoms that could be caused by

either a psychological or physiological condition, Sheriff Woody made a constitutional violation

a "highly predictable consequence." Plaintiff presents sufficient evidence that Sheriff Woody

failed to properly train his subordinates to survive summary judgment.

>           iii.     **Plaintiff Presents Evidence That Sheriff
>                     Woody's Failure to Train His Subordinates
>                     Caused Them to Violate Ms. Jenkins's
>                     Constitutional Right**

To satisfy the third element, Plaintiff must raise a triable issue of fact that Sheriff

Woody's failure to train his subordinates caused them to violate Ms. Jenkins's Fourteenth

Amendment right. Under Plaintiff's theory of causation, had one of Sheriff Woody's deputies

reported Ms. Jenkins's symptoms to medical personnel between approximately 5:00 p.m. and

11:00 p.m., medical personnel would have understood that Ms. Jenkins's symptoms required full

and prompt medical and psychiatric evaluations.

Plaintiff offers testimony from Nurse Royall to show that medical staff would have

responded to reports of Ms. Jenkins's behavior had Sheriff Woody's deputies alerted them. At

4:50 p.m., Nurse Royall immediately responded to the report that Ms. Jenkins had been involved

in a physical altercation. At 10:58 p.m., Nurse Paige responded quickly to Deputy Beaver's

report that Jenkins had urinated on her cell floor. Especially when drawing inferences in

Plaintiff's favor, the Court finds that a reasonable jury could conclude that medical staff would

---

that could be caused by either psychological *or* physiological conditions. As a result, as could
obviously occur regularly, the absence of mental health training would inevitably cause injury to
inmates with serious medical needs because deputies would not know how to observe and report
issues to medical staff.

have also responded to reports of Ms. Jenkins's behavior had Sheriff Woody's subordinates alerted them.

Because neither CCS's physician nor its psychiatrist was present between 5:00 p.m. and 11:00 p.m., the Court also finds, given how the evidence must be viewed on summary judgment, that a reasonable jury could conclude that Ms. Jenkins would have been taken to the emergency room. Plaintiff offers expert testimony about causation.[52] A reasonable jury could separately find that a subsequent emergency evaluation would have revealed that "[Ms.] Jenkins['s] early mental status changes and dehydration reflected early signs of shock related to the developing peritonitis from the perforated ulcer." (Letter from Andres Castellanos, M.D., to Seth Carroll, Esquire, May 27, 2016, at 2, ECF No. 165-33; *see also* Letter from James Levenson, M.D., to Seth Carroll, Esquire, November 4, 2016, ECF No. 165-29.)  Indeed, "[t]he delay by [RCJC] personnel in responding to the signs and symptoms of serious illness . . . delayed medically necessary treatment of her perforated ulcer and eventual peritonitis." (Letter from Andres Castellanos, M.D., to Seth Carroll, Esquire, May 27, 2016, at 2, ECF No. 165-29.)

Plaintiff further proffers testimony that "it was the perforated ulcer with its ongoing sepsis and hypovolemic shock that precipitated [Ms. Jenkins's] cardiac arrest," and that prior to her cardiac arrest, Ms. Jenkins's perforated ulcer was a "relatively easily repairable surgical problem." (Letter from Andres Castellanos, M.D., to Seth Carroll, Esquire, May 27, 2016, at 2, ECF No. 165-29.)  Thus, a reasonable jury could conclude that Ms. Jenkins died because, in the absence of training on proper observation to know when to report to medical staff inmates experiencing symptoms that could be caused by either a psychological or physiological

---

[52] Sheriff Woody offers conflicting expert testimony.  At best, Sheriff Woody, the moving party, creates a genuine dispute of material fact based on his submission.  In that circumstance, a jury must decide the issue.

condition, Sheriff Woody's subordinates delayed her treatment for a perforated ulcer, which ultimately resulted in cardiac arrest and her death.  The Court will deny Sheriff Woody's Motion for Summary Judgment on Plaintiff's Count I to the extent Plaintiff asserts a failure-to-train theory.

### 3.    The Court Will Grant Sheriff Woody Summary Judgment on Plaintiff's § 1983 Claim For Supervisory Liability

The Court will grant Sheriff Woody summary judgment on Plaintiff's Count II, which alleges violation of her Fourteenth Amendment right under a theory of supervisory liability.  The Fourth Circuit has articulated three elements necessary for establishing supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his [or her] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and[,] (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

In order "[t]o satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* (citing *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).  "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (citing *Slakan*, 737 F.2d at 373–74).

As with her claim for an "affirmative" custom or policy of deliberate indifference, *see supra* Section II.B.2.a, Plaintiff frames her claim for supervisory liability too expansively to

36

survive summary judgment. Plaintiff contends that the past conduct posing "a pervasive and unreasonable risk" of constitutional injury was Sheriff Woody's subordinates' *general* failure to observe and report issues to medical. In support of this broad claim, Plaintiff presents two arguments.

First, Plaintiff lists three cases in a footnote that purport to demonstrate Sheriff Woody's knowledge "of delayed care due to failures by deputies to timely report issues to medical." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 25 & n.6.) Plaintiff does not discuss the facts of these cases beyond vague parentheticals noting failures to report. (*Id.*) Most troubling, Plaintiff lists only the docket numbers of those cases, providing no proof to this Court of any evidence establishing the claims pursued. In other words, Plaintiff seeks to support her allegation of "a pervasive and unreasonable risk" of constitutional injury with reference to mere allegations. Such evidence cannot defeat a motion for summary judgment.

Second, Plaintiff identifies the "multiple failures of Gaines, McRae and Beaver to report . . . [Ms.] Jenkins's symptoms to medical" as a basis for summary judgment. (*Id.* at 25.) The failures of Sheriff Woody's subordinates in the instant case, even if found to be pervasive during the timeframe at issue (*i.e.*, the timeframe of Ms. Jenkins's detention), cannot serve as conduct from which Sheriff Woody would have known the risk of constitutional injury suffered by Ms. Jenkins. *See Moore v. Greenwood Sch. Dist. No. 52*, 195 F. App'x 140, 144 (4th Cir. 2006) (per curiam) ("'[A] supervisor cannot be expected . . . to guard against the deliberate criminal acts of his [or her] properly trained employees when he [or she] has no basis upon which to anticipate the misconduct.'" (quoting *Randall v. Prince George's Cty.*, 302 F.3d 188, 206 (4th Cir. 2002)); *see also City of Oklahoma City v. Tuttle*, 7471 U.S. 808, 821 (1985) ("To impose liability under

those circumstances would be to impose it simply because the municipality hired one 'bad apple.'").[53]  Plaintiff's Count II supervisory liability claim cannot survive summary judgment.

### 4. The Court Will Deny Sheriff Woody Summary Judgment on Plaintiff's Gross Negligence Claim

The Court will deny Sheriff Woody summary judgment on Plaintiff's Count VI, which alleges gross negligence, to the extent plaintiff alleges liability through the doctrine of *respondeat superior*.  Plaintiff advances two theories of Sheriff Woody's gross negligence: (1) Sheriff Woody himself acted in a grossly negligent manner; and, (2) Sheriff Woody's subordinates acted in a grossly negligent manner, making Sheriff Woody liable under the doctrine of *respondeat superior*.[54]

In Virginia, "'[g]ross negligence' is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987).  It "amounts to the absence of slight diligence, or the want of even scant care." *Id.*  "[W]hether certain actions constitute gross negligence is generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ." *Koffman v. Garnett*, 574 S.E.2d 258, 260 (Va. 2003) (citing *Griffin v. Shively*, 315 S.E.2d 210, 212 (Va. 1984)).

---

[53] For the same reason, this theory of liability would fail under the second prong, which requires that a plaintiff show "deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Shaw*, 13 F.3d at 799 (citations and internal quotation marks omitted).  Indeed, a plaintiff cannot simply point "'to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his [or her] responsibilities.'" *Id.* (quoting *Slakan*, 737 F.2d at 372–73).

[54] "Under the doctrine of *respondeat superior*, an employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of employment." *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987) (citing *McNeill v. Spindler*, 62 S.E.2d 13, 17 (Va. 1950)).

Plaintiff fails to present evidence sufficient to survive summary judgment on her claim that Sheriff Woody himself acted in a grossly negligent manner.  Sheriff Woody posits that there is "no evidence that [he] had any involvement with or knowledge of [Ms.] Jenkins'[s] incarceration."[55]  (Sheriff Woody Mem. Law Supp. Mot. Summ. J. 26.)  Moreover, Sheriff Woody contracted with CCS to provide medical and mental health care for inmates, and he submits that his deputies were trained on general standards of inmate observation.  In response, Plaintiff contends, in a conclusory manner, that "Woody was deliberately indifferent to and utterly disregarded the safety of a particular class of persons—those confined as inmates in the [RCJC]—by demonstrating an utter disregard to failures by his staff to report and secure medical attention for the serious medical needs of inmates." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 28–29.)

Plaintiff's conclusory statement itself does not permit her claim to survive, and she otherwise provides no evidence to this point.[56]  Even assuming that Plaintiff relies on evidence elsewhere in her briefing to establish Sheriff Woody's gross negligence, her argument fails.

---

[55] Sheriff Woody testified that Ms. Jenkins "didn't die" at the RCJC.  (Woody Dep. 32, ECF No. 113-4.)  Sheriff Woody has also sworn that he "did not know Erin Jenkins and had no knowledge of her incarceration or death until receiving a preliminary report from internal affairs." (Woody Aff. ¶ 6, ECF No. 138-1.)

Sheriff Woody did not review the video surveillance from the night of Ms. Jenkins's incident. (Woody Dep. 32, ECF No. 113-4.)  Sheriff Woody admitted to only a brief review of a preliminary IAD report and testified that he saw the complete IAD report for the first time at his deposition in this case on March 15, 2016, nearly eight months after Ms. Jenkins's death. (Woody Dep. 122–123, ECF No. 113-4.)

[56] Plaintiff suggests in briefing on her gross negligence claim that the Court should "accept Plaintiff's allegations as true." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 28.)  The Court assumes Plaintiff made this statement in error, knowing that, on summary judgment, the Court must view the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, which, here, is Plaintiff. *Liberty Lobby,* 477 U.S. at 255.

Plainly, Sheriff Woody himself did not act with "an utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier*, 362 S.E.2d at 691.

Plaintiff, still, has submitted evidence that could support a claim that Sheriff Woody's subordinates acted in grossly negligent manner, which would make Sheriff Woody liable under the doctrine of *respondeat superior*.[57] Plaintiff argues that Sheriff "Woody's deputies failed to report and otherwise ignored serious and obvious signs of . . . [Ms.] Jenkins['s] serious need for medical attention, thus delaying her access to critical medical care that would have saved her life." (Pl.'s Opp'n Sheriff Woody Mot. Summ. J. 29.) The record permits a reasonable jury to conclude that Sheriff Woody's subordinates, and Deputy Beaver in particular, acted with "an utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier*, 362 S.E.2d at 691.

First, a genuine dispute of material fact exists as to whether deputies transferred Ms. Jenkins off the medical tier in error. More importantly, the record demonstrates that Deputy Beaver observed Ms. Jenkins talking to herself on July 30, 2014, which Deputy Beaver documented. Later, on the overnight shift of July 31, 2014, Deputy Beaver observed Ms. Jenkins and made nine entries of "10-4," but omitted any additional details about her "weird" behavior. Deputy Beaver saw Ms. Jenkins walking the cell during the evening, using a roll of toilet paper like a telephone, tearing up paper and feeding it through the food slot to her imaginary daughter, and sitting on a toilet for ten minutes or an hour. Deputy Beaver also knew that Ms. Jenkins had thrown her food tray and sheet under her bed. Deputy Beaver, however, did not seek medical help until some point later in the evening when Ms. Jenkins urinated in her cell. No video exists to confirm or deny this testimony. While the record indicates that Sheriff Woody's deputies

---

[57] Sheriff Woody does not dispute that his subordinates were acting within the scope of their employment during Ms. Jenkins's detention at the RCJC.

intended to "keep an eye" on Ms. Jenkins and checked her on rounds, the Court must view the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. In light of this evidence, and in the absence of video that would have depicted Jenkins's movements and demeanor for the crucial five hours before she was transported to the hospital, the Court concludes that gross negligence remains an issue for the jury to resolve. The Court will deny Sheriff Woody summary judgment on Plaintiff's Count VI.

**C.    Deputy Beaver's Motion for Summary Judgment**

Deputy Beaver moves for summary judgment on two counts: "Count III: § 1983 Claim Against Jail Staff – Deliberate Indifference to Serious Medical Needs Resulting in Cruel and Unusual Punishment"; and, "Count VI: State Law Claims Against Defendant Sheriff Woody and Jail Staff – Gross Negligence." The Court will deny summary judgment on both counts.

**1.    The Court Will Deny Deputy Beaver Summary Judgment on Plaintiff's § 1983 Claim for Deliberate Indifference to Ms. Jenkins's Serious Medical Needs**

The Court will deny Deputy Beaver summary judgment on Plaintiff's Count III, which alleges violation of the Fourteenth Amendment as a result of Deputy Beaver's deliberate indifference to Ms. Jenkins's serious medical needs. In order to survive summary judgment on this claim, Plaintiff must present triable issues of fact as to two elements. First, Plaintiff must establish that, objectively, the alleged deprivation is sufficiently serious so as to violate the Fourteenth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This element is established by showing that the plaintiff suffered from a serious medical need at the times he or she interacted with the defendant. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

41

Second, the plaintiff must establish that the defendant acted with "deliberate indifference" to the right. *Estelle v. Gamble*, 429 U.S. 97, 97 (1976). Deliberate indifference requires both that the defendant "subjectively recognized a substantial risk of harm" and "that his [or her] actions were 'inappropriate in light of the risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal citation omitted). A mere "error of judgment [or] inadvertent failure to provide adequate medical care . . . [does] not constitute a constitutional deprivation redressable under § 1983." *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979). In other words, negligence is not deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").[58]

For the same reasons the Court concluded that Plaintiff presents evidence that Sheriff Woody's subordinates violated Ms. Jenkins's constitutional rights, the Court finds that Plaintiff presents triable issues of fact as to whether: (1) objectively, the alleged deprivation is sufficiently serious so as to violate the Fourteenth Amendment; and, (2) Deputy Beaver acted with deliberate indifference to the right. *See supra* Section II.B.2.b.i (finding that a perforated duodenal ulcer was, objectively, a "serious medical need" and that Deputy Beaver's observations could cause a reasonable jury to conclude that Deputy Beaver was subjectively aware of a risk to Jenkins's health or safety).

---

[58] "A prison official shows deliberate indifference if he [or she] knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the [Fourteenth] Amendment is to ensure reasonable safety." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted).

### 2. Disputes of Material Fact Preclude Deputy Beaver's Entitlement to Qualified Immunity

#### a. Qualified Immunity Standard

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This protection "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on questions of law and fact.'" *Id.* (citation omitted). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (citation omitted). This allowance for reasonable mistakes balances "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

"[Q]ualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right[;] and[,] (2) whether that right was clearly established[59] at the time of the alleged violation." *Raub v. Campbell*, 785 F.3d 876, 880–81 (4th Cir. 2015). The Court is free to "address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case." *Id.* (internal quotations omitted).

---

[59] "The right at issue must be defined 'at a high level of particularity.'" M.C. ex rel. Crawford v. Amrhein, 598 F. App'x 143, 146 (4th Cir. 2015) (quoting *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013)). "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Id.* at 147 (quoting *Anderson*, 483 U.S.at 640).

43

"[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 180 (4th Cir. 1998) (internal quotations omitted). This is because "[d]isputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995) (citing *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

> **b.** **On the Record Before It, the Court Cannot Conclude that Deputy Beaver Did Not Violate Ms. Jenkins's Clearly Established Constitutional Right**

Deputy Beaver concedes that the Constitution's protections against deliberate indifference to an inmate's serious medical needs are clearly established. However, Deputy Beaver suggests that the parameters of a deliberate indifference claim, as applied to the facts of this case, are *not* clearly established. Even if Deputy Beaver's legal argument ultimately has merit, at a minimum, there exist material facts in dispute regarding Deputy Beaver's precise conduct.

Most alarming, the "best evidence" about whether Deputy Beaver's conduct stayed within constitutional bounds—what Sheriff Woody called the "real live thing of what's happening, what—what really happened," (Woody Dep. 27, ECF No. 113-4)—has been destroyed or otherwise not preserved. Without the video of Ms. Jenkins's behavior in Section 3A1, the Court cannot make the finding, as a matter of law, that Deputy Beaver's response (or lack thereof) constituted deliberate indifference in a manner that violated clearly established constitutional law. Accordingly, at this stage, Deputy Beaver is not entitled to summary judgment on qualified immunity grounds. *See Vathekan*, 154 F.3d at 180 ("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute

regarding the actual conduct of the defendants."). The Court will deny Deputy Beaver summary judgment on Plaintiff's Count III.

### 3. The Court Will Deny Deputy Beaver Summary Judgment on Plaintiff's Gross Negligence Claim

The Court also will deny Deputy Beaver summary judgment on Plaintiff's Count VI, alleging gross negligence. For the same reasons the Court concluded that Plaintiff presents evidence that would permit a jury to conclude that Sheriff Woody is liable, through the doctrine of *respondeat superior*, for the actions of his subordinates, the Court finds that a jury could likewise conclude that Deputy Beaver acted with "an utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier*, 362 S.E.2d at 691. Again, the missing video that would have depicted the final five hours of Ms. Jenkins's detention at the RCJC functionally raises a jury question about whether Deputy Beaver's conduct remained in constitutional bounds. Thus, triable issues of fact remain, and the Court concludes that the jury should decide whether Deputy Beaver acted with gross negligence. The Court will deny Deputy Beaver summary judgment on Plaintiff's Count VI.

### 4. The Court Will Deny Deputy Beaver Summary Judgment on Plaintiff's Punitive Damages

The Court will deny Deputy Beaver summary judgment on Plaintiff's request for punitive damages. Deputy Beaver does not dispute that plaintiffs may recover punitive damages in certain § 1983 cases against individual defendants. *See Washington v. Jurgens*, No. 3:16cv184, 2016 WL 3661320, at *10 (E.D. Va. July 1, 2016) ("The touchstone for punitive damages liability in [§] 1983 cases is whether the named [d]efendant officers acted with malice or in callous disregard of [p]laintiff's federally-protected rights." (citing *Smith v. Wade*, 461 U.S. 30, 51–52 (1983); *Robles v. Prince George's Cty.*, 302 F.3d 262, 273 (4th Cir. 2002)). Deputy Beaver also does not dispute that plaintiffs may recover punitive damages in a gross negligence

45

case. *See Blakely v. Austin-Weston Ctr. for Cosmetic Surgery L.L.C.*, 348 F. Supp. 2d 673, 677–78 (E.D. Va. 2004) ("[T]o sustain a claim for punitive damages in a personal injury case, the plaintiff must demonstrate '[n]egligence which is so willful or wanton as to evince a conscious disregard of the rights of others, [or] malicious conduct . . . .'" (quoting *Doe v. Isaacs*, 579 S.E.2d 174, 176 (Va. 2003)).  Deputy Beaver, nonetheless, argues that the record would not permit a reasonable jury to conclude that punitive damages should be awarded in this case.  As previously discussed, the record before the Court contains disputes of material fact.  Primary among those facts is that the "best evidence" of Deputy Beaver's conduct (and the circumstances that could support a finding of callousness) has been destroyed.  For the same reasons the Court will deny summary judgment on Plaintiff's deliberate indifference and gross negligence claims, even absent an adverse inference instruction, the Court must let a jury decide Plaintiff's request for punitive damages.

### III.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Sheriff Woody's Motion for Summary Judgment and deny Deputy Beaver's Motion for Summary Judgment.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 1/21/17