IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**VIRGINIA PAIGE JENKINS,**
*Administratrix of Estate of Erin Jenkins,*

        **Plaintiff,**

v.                                           **Civil Action No. 3:15cv355**

**SHERIFF C.T. WOODY,** *et al.,*

        **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff Virginia Paige Jenkins's[1] Motion for Sanctions Relating to Sheriff Woody's Intentional Spoliation of Evidence and Failure to Adequately Respond to Discovery (the "Motion for Sanctions"). (ECF No. 112.) Sheriff C.T. Woody responded, (ECF No. 114), and Plaintiff replied to Sheriff Woody's Response, (ECF No. 116). Defendants Deputy Elizabeth Beaver, Corporal Vivian Hudson-Parham, and Lieutenant Johnny Scott (collectively, the "Jail Staff")[2] responded to Plaintiff's Motion for Sanctions, (ECF No. 115), and Plaintiff replied to Deputy Beaver's Response, (ECF No. 117). The Court heard oral argument on the Motion for Sanctions. Accordingly, the matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[3] and 1367.[4] For the

---

[1] Because the plaintiff in this matter, Virginia Paige Jenkins, Administratrix of the Estate of Erin Jenkins, has the same last name as Erin Jenkins, the subject of this case, the Court refers to Virginia Paige Jenkins as "Plaintiff" and Erin Jenkins as "Ms. Jenkins."

[2] Of the Jail Staff, only Deputy Beaver remains as a defendant.

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Third Amended

reasons that follow, the Court will grant Plaintiff's Motion for Sanctions.   The Court will impose

sanctions for the reasons discussed below.

## I.  Background

On June 11, 2015, Plaintiff filed her Complaint.   (ECF No. 1.)   This action involves Ms.

Jenkins's death while in custody as a pretrial detainee at the Richmond City Justice Center

("RCJC").   Ms. Jenkins entered the RCJC on July 25, 2014, three days before its formal opening.

On August 1, 2014, four days into the RCJC's operations, Ms. Jenkins was found in her cell

incoherent, incontinent, and not breathing.   Ms. Jenkins was transported from the RCJC to VCU

Medical Hospital, where she died on August 2, 2014.[5]

Plaintiff alleges that Ms. Jenkins's death was caused by Sheriff Woody's and Deputy

Beaver's deliberate indifference to Ms. Jenkins's serious medical needs in violation of her rights

under the Fourteenth Amendment to the United States Constitution.[6]   Plaintiff further claims that

by failing to attend to Ms. Jenkins's serious medical needs, Sheriff Woody and Deputy Beaver

---

Complaint alleges Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 and brings
pendent claims of gross negligence against Deputy Beaver and Sheriff Woody.

[4] The Court exercises supplemental jurisdiction over Plaintiff's gross negligence claim
pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original
jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so
related to claims in the action within such original jurisdiction that they form part of the same case
or controversy . . . .").

[5] The facts surrounding Ms. Jenkins's death are more fully set forth in the Court's
Memorandum Opinion on the defendants' motions for summary judgment.   (See ECF No. 271.)

[6] The Fourteenth Amendment states in part:   "No State shall make or enforce any law
which shall abridge the privileges or immunities of citizens of the United States; nor shall any
State deprive any person of life, liberty, or property, without due process of law . . . ."   U.S. Const.
am. XIV.

breached the duty of care they owed Ms. Jenkins and were grossly negligent in monitoring Ms. Jenkins and meeting her medical needs.

### A.    The Discovery Dispute

In the spring of 2016, Plaintiff first raised the issue of a missing video that had recorded the last hours of Ms. Jenkins's detention, prior to her death.   Plaintiff argued that Sheriff Woody had not "preserved or produced any video data, or data from the video server [in the RCJC] as requested."   (Joint Stipulation of Disc. Dispute 2, ECF No. 69.)   Plaintiff asserted that "cameras are positioned to view the area outside" the cell in which Ms. Jenkins was housed at the RCJC, that those cameras were capable of recording, and that those cameras did record when activated by movement.   (*Id.* at 4.)   Plaintiff sought access to the servers to attempt to recover relevant video footage because she believed that "recordings from these cameras and stored on this server ha[d] been reviewed by Defendant Woody's agents . . . . as early as August 8, 2014."   (*Id.* at 8–9.) Plaintiff proposed to bear the cost of this inspection herself.   Sheriff Woody opposed Plaintiff's proposed inspection, arguing that "[P]laintiff seeks to 'recover' data long purged and to impose a burden on Sheriff Woody which the Federal Rules and the law do not require."   (*Id.* at 9.)

On April 15, 2016, the Court held a hearing on the discovery dispute.   While Plaintiff admitted that it was "highly unlikely" that any video data would be recovered, she asked permission to attempt a recovery because Sheriff Woody had made no effort to do so.   Through counsel, Sheriff Woody declared that no evidence existed that any RCJC staff had ever viewed the video, and that the video data could not be retrieved.   Despite asserting that no one had ever viewed the video, Sheriff Woody, through counsel, represented that he knew the footage would not have helped Ms. Jenkins:   "All that they would have seen is Ms. Jenkins, who was in a medical

3

observation cell because she was going through detox withdrawal,[7] was having strange behavior, and that's what was going on.   So there would be no need to have preserved that."   (*Id.* at 23.) Sheriff Woody contended that, although the video "would be relevant, clearly, [as] the best evidence of what happened," (*id.* at 12), it would be futile to try to recover it because "[y]ou can't get blood from a stone," (*id.* at 8).

In ruling on various disputes, the Court noted that Sheriff Woody's initial response to Plaintiff's written discovery requests violated the Federal Rules of Civil Procedure.   Specifically, Sheriff Woody failed to address the existence or non-existence of video evidence by ignoring that aspect of Plaintiff's discovery request, in violation of Rule 33(b)(3).[8]   The Court echoed Sherriff Woody's irrefutable admission that no better evidence could exist as to what happened to Ms. Jenkins in her last hours at the RCJC.   Thus, given the crucial nature of the evidence, and despite the parties' suggestion that it might be an uphill climb, the Court found that the benefit of attempting to recover the footage outweighed the burden.   The Court therefore allowed Plaintiff to try to "obtain a mirror image of the server information at issue to [see] if any forensic video image exists of the events leading up to Erin Jenkins's death."   (Order 2, ECF No. 82.)

---

[7] The record on summary judgment does not comport with counsel's representation that Ms. Jenkins was in the medical observation unit for detoxification.   Dr. Emran, the medical doctor who treated Ms. Jenkins in the RCJC, testified that her physiological and hallucinatory symptoms were inconsistent with withdrawal.   The doctor ordered that Ms. Jenkins stay on the medical tier for observation, but she was transferred out under disputed circumstances:   either a deputy effectuated a transfer with a medical staff imprimatur afterward, or the medical department ordered the transfer.

[8] Rule 33(b)(3) provides:   **"(3) *Answering Each Interrogatory.***   Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3).

4

## B.   The Motion for Sanctions

### 1.   The Parties' Initial Briefing

Plaintiff filed the Motion for Sanctions, alleging two sanctionable discovery violations.[9]

First, Plaintiff claims that "Sheriff Woody[10] intentionally destroyed or failed to preserve [the

video footage of the night of August 1, 2014, (the "Video Data")]."   (Pl.'s Mem. Supp. Mot.

Sanctions 2, ECF No. 113.)   Second, Plaintiff charges that Sheriff Woody "did not initially

produce the complete [Internal Affairs Division ("IAD")] investigative file and audio recordings,"

even though at least five of Plaintiff's Requests for Production should have required Sheriff

Woody to provide Plaintiff with the complete file.   (*Id.* at 8–9.)   Instead, Sheriff Woody initially

produced *part* of the IAD investigative file, but did not produce the audio recordings until more

than six months after Plaintiff requested them.   Even then, Sheriff Woody produced the audio

recordings only after Plaintiff learned through deposition testimony that they existed.

Throughout briefing, Plaintiff seeks default judgment or an adverse inference instruction

for Sheriff Woody's intentional destruction of the video and his deliberate failure to respond to

Plaintiff's discovery by waiting months to disclose the IAD file and the audio recordings

---

[9] In order to have a reliable factual record and to address potential prejudice properly, the Court reserved ruling on sanctions until it also heard arguments for summary judgment.   On January 11, 2017, the Court heard oral argument on the Motion for Sanctions simultaneous to argument on the motions for summary judgment.

[10] Plaintiff correctly observes that "standard principles of agency law apply to spoliation actions."   (Pl.'s Mem. Supp. Mot. Sanctions 11.)   Therefore, whether Sheriff Woody himself committed the alleged spoliation is irrelevant.   He may be held responsible for the destruction of, or failure to preserve, relevant evidence by RCJC employees.   *See Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 523, n.16 (D. Md. 2009) ("A party may be held responsible for the spoliation of relevant evidence done by its agents.").   Thus, for simplicity, the Court will refer to any alleged spoliation as committed only by Sheriff Woody.

associated with it, thereby prejudicing Plaintiff further.   Plaintiff also consistently seeks attorneys' fees and other monetary damages incurred as a result of Sheriff Woody's spoliation.

In response, Sheriff Woody just as consistently denies any wrongdoing.   Sheriff Woody contends that an "automatic overwriting" of the video, and an "inadvertent delay" in producing the audio file—cured swiftly once *counsel* learned of the audio tapes—cannot amount to intentional, willful, or bad faith conduct.   (Woody's Opp'n Pl.'s Mot. 1–2, ECF No. 114.)   Sheriff Woody's initial briefing does not counter Plaintiff's arguments about attorneys' fees.   Similarly, Deputy Beaver challenges the Motion for Sanctions, stressing that Sheriff Woody had no duty to preserve the Video Data when it was overwritten because "[l]itigation was not reasonably anticipated before the digital videos were automatically overwritten."   (Beaver's Opp'n Pl.'s Mot. 9, ECF No. 115.)

### 2.   The Parties' Supplemental Briefing After Oral Argument

After oral argument on the Motion for Sanctions, the Court allowed the parties to submit additional briefing on the sanctions, suggesting they focus on the extent of prejudice Plaintiff suffered from the loss of the Video Data, and giving the parties an opportunity to clarify their legal arguments about all aspects of Federal Rule of Civil Procedure 37(e).   In her supplemental submission, Plaintiff again seeks default judgment or an adverse inference instruction, suggesting that significant circumstantial evidence demonstrates Sheriff Woody's intent to deprive Plaintiff of use of the Video Data in this litigation when he destroyed or failed to preserve it.   Plaintiff asserts that proving intent to deprive under Rule 37(e)(2), as with other legal matters requiring proof of intent (such as criminal or employment actions), absent an admission of culpability, often *must* be achieved with circumstantial evidence.

6

When asking the Court, in the alternative, to exercise its broad power to fashion sanctions necessary to cure the prejudice, Plaintiff also emphasizes the significant prejudice she incurred. Noting that the Video Data contained the only neutral and unbiased depiction of what happened during the last five hours of Ms. Jenkins's imprisonment, Plaintiff contends that she now cannot use the best evidence to fully illustrate any serious medical need, any symptoms of pain or suffering, or any indifference Deputy Beaver demonstrated to Ms. Jenkins's serious medical needs.   Concomitantly, Plaintiff adds, because the video is gone, "Deputy Beaver is free to provide a functionally unchecked version of events in which she did not perceive Ms. Jenkins'[s] serious medical need and therefore was not deliberately indifferent to the same."   (Pl.'s Suppl. Memo 17, ECF No. 254.)

Plaintiff suggests at least seven sanctions short of default or an adverse inference instruction to cure the prejudice she suffered:

(1)   Issuing an instruction to the jury that a video had been captured depicting the events that occurred while Ms. Jenkins was in Mental Health Segregation and that Sheriff Woody destroyed the video after he reviewed it despite having a legal duty not to and the jury is free to draw inferences from that fact about the contents of the video, but not required to;

(2)   Precluding any evidence or contention at trial that the contents of the video corroborated the Defendants' version of events;

(3)   Issuing an instruction to the effect that should Plaintiff prove by a preponderance of the evidence that Ms. Jenkins'[s] duodenum was perforated during the time she was in the Mental Health Segregation Unit, the jury should presume that Ms. Jenkins was exhibiting the symptoms of that medical condition which Plaintiff has also proven to a reasonable degree of medical certainty;

(4)   Precluding any evidence or contention at trial that Ms. Jenkins'[s] duodenum was not perforated and that she was not exhibiting symptoms of a perforated duodenum during the time she was in the Mental Health Segregation Unit;

7

(5)   Precluding any argument that medical or mental health staff could have seen Ms. Jenkins and not acted on their observations[;]

(6)   Precluding any argument or evidence that on August 1, 2014, Ms. Jenkins was exhibiting "the same," "identical," or "similar" symptoms as those she demonstrated on July 31, 2014 when she was seen by Dr. Emran[;]

(7)   Precluding any defense that Ms. Jenkins was moved from 2MED to 3A1 on August 1, 2014 consistent with RCJC policy[; and,]

(8)   Precluding any evidence or argument that Deputy Beaver was performing her duties during her shift on August 1, 2014 in accordance with her training or RCJC policy and procedure.

(*Id.* at 20–21.)

In response, Sheriff Woody reiterates "that the duty to preserve in this case arose no earlier than when [P]laintiff's counsel submitted a FOIA request dated August 26, 2014." (Woody's Suppl. Mem. 1, ECF No. 253.)  Should the Court find otherwise, Sheriff Woody suggests that "the appropriate sanction . . . is to permit both parties to present evidence and argument to the jury regarding the videotape." (*Id.* at 2.)  Again functionally conceding the central importance of the Video Data, Sheriff Woody asserts that "[l]imiting Deputy Beaver's testimony is inappropriate [because] it would preclude Sheriff Woody from offering evidence central to his defense." (*Id.* at 3.)  Sheriff Woody contends that "the fairer approach would be to permit Sheriff Woody and [P]laintiff to present evidence and argument regarding the Sheriff's failure to preserve the videotape and to allow the jury to weigh the witnesses' credibility on that issue." (*Id.*)

Only Deputy Beaver claims that Plaintiff has experienced no prejudice from the absence of the Video Data.  Ignoring any credibility determination that a jury need make, Deputy Beaver contends that her contemporaneous Logbook entries and her reports afterward have not, and presumably should not, be questioned because Plaintiff "has not cited any reason to suggest that

8

[Deputy] Beaver has been forgetful about the events of August 1."[11]   (Beaver's Suppl. Mem. 2,

ECF No. 255.)   In the alternative, Deputy Beaver suggests that the jury simply be informed that

the video existed and was not saved.   Deputy Beaver opposes any additional sanctions against her

because it would exceed those necessary to cure Ms. Jenkins's prejudice, especially given

Plaintiff's decision not to seek sanctions against Deputy Beaver.

C.   **The Alleged Spoliation:   The Overwritten Video Data**

1.   **Underlying Facts**

The RCJC opened in late July 2014 equipped with a new video recording system that

included more than 500 cameras covering the jail inside and out.   Ms. Jenkins entered the RCJC

in its first week of operation, three days before its official opening on July 28, 2014.   On August 1,

2014, the night before Ms. Jenkins's death, and her last night in the RCJC, cameras were "working

and operational" and recording properly in and around her cell.[12]   (Witham Dep. 82, ECF No

113-2.)

Sheriff Woody testified that video surveillance in the jail serves many purposes:

Well, live action that can be monitored on certain on—on—on the pods.   I can
come in here and, if an incident happened yesterday or two weeks from now, put
the date, you put the time in and you can replay the whole thing.   And you can use

---

[11] This argument runs entirely counter to Deputy Beaver's own testimony that she wrote four incident reports because she initially left things out "due to some confusion."   (March 14, 2016 Beaver Dep. ("Beaver Dep. I") 101, ECF No. 147-1.).   The argument also ignores that Deputy Beaver's Logbook entries completely omit any observations about Ms. Jenkins's behavior while in Section 3A1, (Logbook 18–19, ECF No. 138-9), and fail to mention any of the discussions that Deputy Beaver later testified she had with Ms. Jenkins during the evening of August 1, 2014. (Beaver Dep. I 101–02.)

[12] The video system in the RCJC is programmed to record "when movement is observed. When there's no movement, they don't record."   Recordings from the surveillance cameras were to stay on the server for thirty days, after which the data is overwritten.   (Witham Dep. 70–71.) "[W]hen [video surveillance data is] overwritten, it's gone."   (*Id.* at 87.)

9

it for investigative purposes.   You can use it for safety purposes.   You can use it for people that's—the resident them self [sic] who lies oftenly [sic] about how something happened and what happened before.

And so it's a—*sort of a truth serum.*   It's been very, very helpful to us employment-wise as well as safety-wise and for the residents when they file grievances and *just a real live thing of* what's happening, what—*what really happened.*

(Woody Dep. 27, ECF No. 113-4 (emphasis added).)   In this case specifically, Sheriff Woody's

counsel admitted during argument, as he must, that "If [the video] existed, . . . it would be relevant,

clearly.   The video is the best evidence of what happened."   (Tr. Disc. Dispute Hr'g 12.)

## 2.   The IAD Investigation

The RCJC requires that, when an inmate dies, "somebody notify IAD and IAD conduct[]

an investigation."   (Woody Dep. 17.)   Sheriff Woody testified that IAD investigates every death

of someone in custody:

[t]o determine the cause.   To determine whether there was any evidence of foul play.   To determine whether there's any evidence of negligence.   To determine any safety violation and things of that nature.   To do a complete investigation, who, when, where, why and what, and the cause.

(*Id.*)   Sheriff Woody confirmed that the IAD investigation of an inmate's death should begin

"immediately."   (*Id.* at 116.)   Sheriff Woody also assured that the IAD review of any available

video surveillance should occur soon after the IAD investigation begins.[13]   Sheriff Woody expects

that IAD investigators will pull video surveillance from the date, time, and location of the inmate's

death as part of their investigation.

---

[13]  Sheriff Woody confirmed that pulling a video file constitutes such a fundamental investigative step that it requires no order.   He stated that he did not need to ask Lieutenant Colonel Lawson to pull a video during an IAD investigation because Lawson is "smart.   He's bright.   He's intelligent—he's intelligent, automatically.   He's been investigating for years.   [I]f I have to tell him [to pull the video], I don't need him to be in charge of investigations."   (Woody Dep. 30.)

Sheriff Woody has placed Lieutenant Colonel Lawson in charge of IAD investigations. Lawson testified that he expected an investigator—in this case Major Weaver—to review or access the video surveillance "within a couple days" or, at the "[e]arliest—I guess the earliest convenience [in the Ms. Jenkins case] would be that Monday [August 4, 2014,] or Tuesday [August 5, 2014]." (Lawson Dep. 49–50.) When testifying, Lawson also confirmed the obvious: the IAD investigator should review the video evidence because "[t]he investigator . . . [was not] present during any incident so [IAD is] looking for video to get [its] perspective on things that happened." (*Id.* at 50.)

Lawson also explained that, when investigating an inmate death, an IAD investigator "will create a disk of the video surveillance and include it with the [IAD] file."[14] (*Id.* at 54.) The process involves "put[ting] a disk in and push[ing] a button."[15] (*Id.*) According to Lawson, virtually without fail, an inmate's IAD investigative file contains CDs with video and audio recordings on them. Lawson could not "think of a time" when an IAD investigative file did not contain video and audio recordings. (*Id.* at 43.)

Apparently, Ms. Jenkins's IAD investigative file is the exception to the rule. Not only does Ms. Jenkins's IAD investigative file lack a video recording, not a single member of Sheriff Woody's staff, including key players in the jail and in IAD investigations, can testify—despite the consistent witness verification of the vital nature of doing so—that he or she even *saw* the video

---

[14] While no explicit policy exists, generally the video "is attached to the file, [and] the file is preserved." (Lawson Dep. 55.) These files are kept indefinitely.

[15] Sheriff Woody testified that he, too, can easily access the video recordings himself from his office; that he has done so on "numerous occasions" in the past; that he has done so previously with respect to an inmate's death or injury in the jail; and, that he has never been unable to access the video. (Woody Dep. 31–32.)

before it was overwritten.   First, without explanation for the failure to follow recognized and

fundamental investigative procedures, IAD Investigator Major Weaver acknowledged that she

never viewed the video of Ms. Jenkins's cell and that she could not recall whether anyone else had

told her that they did:

> Q:  Did you see the video or did you not see the video around Ms. Jenkins'[s] cell?
> A:  I did not.
> . . . .
> Q:  Did anyone else tell you that they reviewed the video . . . around this incident,
> around Ms. Jenkins's cell?
> A:  Not that I recall.

(Weaver Dep. 94.)

Second, despite the crucial perspective it could offer into an inmate death that occurred

during the first week of RCJC's operation, Lawson, who supervised Weaver, swore that he could

not remember whether he viewed a video of Ms. Jenkins's cell when the IAD investigation

began.[16]  Lawson also did not "recall" whether he tried to look at the video of the incident *at any*

*point*, (Lawson Dep. 78), and he could not "answer [the] question" as to why he would not have

told someone to pull the video.   (*Id.*)   Third, Major Ken McRae, assigned to jail operations, could

not recall anyone talking to him about pulling security camera footage from the area where Ms.

Jenkins was housed.   (Ken McRae Dep. 22.)

Fourth, even though Ms. Jenkins died in the first week after the new RCJC facility opened,

Sheriff Woody confirmed that he, too, never reviewed the video of Ms. Jenkins's jail cell.   When

---

[16] Lawson stated under oath:

> Q:  Did you review any video surveillance when you came in?
> A:  I don't remember.

(Lawson Dep. 20.)

asked if there was a reason he "did not look at—try to look at the video [himself] in this case,"
Sheriff Woody flatly replied, "No." (Woody Dep. 32.) Sheriff Woody also testified that he did
not know, at first, that the Video Data had been overwritten. He learned only after this case was
filed that the video of Ms. Jenkins's cell had not been preserved because of "[t]echnology."
(Woody Dep. 170.)

Not surprisingly, Deputy Beaver, who was supervising Ms. Jenkins in 3A1 the night of the
incident, did not personally review the video surveillance of Ms. Jenkins from that night.
However, contrary to testimony of other RCJC staff, Deputy Beaver stated that she thought that,
during an interview with Weaver approximately a week after Ms. Jenkins's death, Weaver had told
her that someone from IAD "watched the tape, [and] everything was done correctly." (Beaver
Dep. I 24–25.) The August 8, 2014 audiotape of Weaver's interview of Deputy Beaver (which
Sheriff Woody failed to produce for six months) concludes with Deputy Beaver saying, "You'all
watched the tape. You saw I watched her, I talked to her, I did what I was supposed to do."
(Transcript of Interview of Deputy Beaver 9–10, ECF No. 254-6.) Inscrutably, Weaver responds
only by saying, "Okay," and immediately concluding the six-minute interview. (*Id.* at 10.)
Weaver did not "at all" recall telling Deputy Beaver that she had reviewed the video. (Weaver
Dep. 94.)

### 3.    The IAD Investigator's Conclusion

That said, Deputy Beaver testified correctly about the IAD investigator's conclusion.
Despite not having viewed the "real live thing of . . . what really happened," (Woody Dep. 27),
Weaver concluded that "none of the [RCJC] staff did anything wrong." (Weaver Dep. 162.)

Weaver did not, however, include that conclusion in her written IAD report, nor could she recall why she did not include that conclusion in the report.

Finally, Sherriff Woody testified that Lawson's briefings patently established that Ms. Jenkins's death involved no foul play and flowed from natural causes.   Despite the fact that Sheriff Woody had not seen the full IAD Report until the day of his March 15, 2016 deposition, he "remember[ed] specifically that it was not any foul play involved [and there was] no violation of SOP or policies.   And that it was a natural death due to her illness."   (Woody Dep. at 122–23.) Sheriff Woody stated repeatedly that "there was no signs of foul play" and "no violations whatsoever."   (*Id.* at 123.)

### D.   Sheriff Woody's Knowledge

#### 1.   Lawson Briefed Sheriff Woody on the IAD Investigation

Sheriff Woody makes evident that Lawson briefed him on the IAD investigation before the investigation was closed.   Sheriff Woody testified that "[Lawson later] just verified that there was no signs of foul play, the cause of death was natural, whatever she died from.   I don't—I don't really know.   And always, additional stuff may come up in an investigation, but as far as was there any signs of foul play and the cause of death, it was over with."   (*Id.* at 123.)   Sheriff Woody relied on Lawson's briefings because "[i]t's impossible for me to read all of the reports.   I was briefed on it on numerous occasions by Lieutenant Colonel Joel Lawson. . . ."   (*Id.* at 122.)

#### 2.   Circumstances Indicating Foreseeability of Litigation

Plaintiff suggests three reasons why this Court should find that Sheriff Woody reasonably anticipated litigation immediately after Ms. Jenkins's death.   First, Plaintiff argues that Sheriff Woody was on notice because his own IAD procedure begins "immediately," and at the "earliest" possible moment any time an inmate dies at the jail, or is transported from the jail to a hospital by

14

EMS.  Plaintiff posits that this commonsensical jail policy seeking to review and preserve the

"real live thing of . . . what really happened," (Woody Dep. 27), could equate to a reasonable

anticipation of litigation.   Second, Plaintiff contends that once a death occurs, Sheriff Woody in

particular should anticipate litigation, given what Plaintiff characterizes as the high rate of inmate

deaths in his facility relative to other jails.[17]   More concretely, Plaintiff highlights a total of four

cases filed in this Court, including this one, alleging violations of civil rights under 42 U.S.C.

§ 1983 after prisoners died in Sheriff Woody's custody.[18]   Plaintiff also lists four cases filed in the

Circuit Court for the City of Richmond.[19]   In sum, Plaintiff argues that, by now, due to the large

---

[17] Plaintiff cites media reports describing a higher rate of jail deaths in the RCJC than other facilities.   The Court does not rely on any media reports when deciding Plaintiff's Motion for Sanctions or the contemporaneously-filed Motions for Summary Judgments.

[18] Including this case, *Jenkins v. Woody et al.*, 3:15cv355 (E.D. Va. 2015), Plaintiff cites: *Woodson v. City of Richmond, et al.*, 3:13cv134 (E.D. Va. 2013) (alleging that pretrial detainee died of hyperthermia while held in the Richmond City Jail); *Sleeper v. City of Richmond, Virginia*, 3:12cv441 (E.D. Va. 2012) (alleging that 55-year-old pretrial detainee died of hyperthermia while held in the Richmond City Jail); and, *In re Estate of Wingfield*, 3:06cv247 (E.D. Va. 2006) (alleging that a pretrial detainee died of hypertensive arteriosclerotic cardiovascular disease while held in the Richmond City Jail).
    This Court's docket reveals at least two more jail death cases lodged against Sheriff Woody:   *Hill Myrick v. Naphcare, Inc. et al.*, 3:16cv952 (E.D. Va. 2016) (alleging that 26-year-old pretrial detainee withdrawing from benzodiazepines died after being placed in a restraint chair); and, *Giddens-Thomas v. City of Richmond, et al.*, 3:15cv324 (E.D. Va. 2015) (alleging that 36-year-old pretrial detainee died of hyperthermia while held in the Richmond City Jail).   Thus, Sheriff Woody has been the defendant in six jail death cases in this Court since becoming Sheriff.   That said, the Court makes no presumptive finding, nor could it, on the merits of any current or former case.

[19] Plaintiff identifies the following jail death lawsuits against Sheriff Woody in Virginia Circuit Court for the City of Richmond:   *Estate of Michael A. Cosby v. Correct Care Solutions, LLC, et al.*, No. CL15-1505 (Richmond Circuit Court 2015) (alleging that a 27-year-old pretrial detainee died of peritonitis due to a perforated duodenal ulcer on or about April 12, 2014, while held in the Richmond City Jail); *Caputo v. Woody, et al.*, No. CL12-3990 (Richmond Circuit Court 2012) (alleging that a 45-year-old diabetic inmate with congestive heart failure serving 15 days died after being denied medical care and prescription medications while held in the Richmond City Jail); *Michael Talbert v. Woody, et al.*, No. 760CL12-3165 (Richmond Circuit Court 2012)

15

number of cases involving inmate deaths in jail brought against Sheriff Woody, (at least ten in ten

years) Sheriff Woody personally, and not just any Sheriff, should reasonably anticipate litigation

as soon as an inmate dies in his custody.[20]   Finally, Plaintiff contends that Sheriff Woody himself

acknowledged the obvious—that lawsuits are common when someone dies in jail—during his

testimony:

> Q:  [W]hen people die in the jail, is it common for lawsuits to follow?
> A:  That's how you-all make your money.
> Q:  Is that a yes?
> A:  Yes.

(Woody Dep. 30.)

Sheriff Woody responds that the record before this Court evinces "no evidence that

Sheriff Woody had experience in past lawsuits where an inmate suffered a medical emergency,

---

(alleging that a 41-year-old pretrial detainee died of kidney failure after being denied prescription medications and medical treatment while held in the Richmond City Jail); *Gaines v. Senior Health Ctr., et al.*, No. CL09-2343 (Richmond Circuit Court 2009) ($2.4 million jury verdict against defendants for wrongful death of 46-year-old pretrial detainee).   Thus, Sheriff Woody has been a defendant in at least four jail death cases in Richmond Circuit Court since becoming Sheriff.   This observation, once again, goes only to notice.

[20] The Court does not consider evidence of lawsuits after inmates died in custody for either propensity or for the truth of the underlying claims, but only to the extent that it might tend to show whether Sheriff Woody should reasonably anticipate litigation when another inmate dies in his custody.   The Court acknowledges that all but one of the cases Plaintiff cites involve different causes of death and, often, occurred in the former facility.

However, the frequency with which Sheriff Woody has been sued after an inmate died in his custody may place him on notice that litigation is reasonably foreseeable when another inmate death occurs.   Understandably, and presumably because all cases differ, Sheriff Woody offers no information about whether similar cases have occurred but have not resulted in litigation, but this means that the record lacks any evidence contrary to notice.   The Court does not weigh any substantive legal issues, but rests on common sense to invoke an evidentiary inference that could pertain.   A minimum of ten lawsuits in ten years, this Court notes, could suffice to establish notice of future litigation in a later-filed jail death case.   Any notice observations in this decision, therefore, would pertain only to Sheriff Woody's unique circumstances and could not speak to any other Sheriff or Warden in the Commonwealth.

was taken to the hospital and, according to the Medical Record, died solely from a natural cause."[21]

(Woody's Opp'n Pl.'s Mot. 7.)

E.      **Prejudice to Plaintiff**

1.      **Plaintiff's Inability to Retrieve the Video Data**

On August 26, 2014, twenty-four days after Ms. Jenkins's death, Plaintiff, through

counsel, sent a request to Sheriff Woody pursuant to the Virginia Freedom of Information Act, Va.

Code §§ 2.2–3700 *et seq.* (the "FOIA"), requesting, *inter alia*, all "electronically stored

information" relating to Erin Jenkins.   (Letter from Jonathan Halperin to Sheriff C.T. Woody, Jr.

1–2, ECF No. 115-1.)   On October 13, 2014, Sheriff Woody, through counsel, responded to the

request.

Recordings from the surveillance cameras were programmed to stay on the server for thirty

days, after which the data would be overwritten.   By the time the RCJC staff responded to the

FOIA request, the surveillance video no longer existed on the server, though the recordings still

saved were "very close but it didn't go far enough" to preserve the August 1, 2014 video

surveillance.   (Witham Dep. 85.)   Although Plaintiff made the FOIA request within the

thirty-day window in which video recordings were supposed to be retained on the server, the RCJC

determined that the cameras in the section of the jail in which Ms. Jenkins was housed were

"recording more than [they were] supposed to record because the motion sensitivity was set too

high, and therefore the amount of expected data was taken up quicker than 30 days."   (*Id.* at 84.)

The RCJC contacted the company that managed the server in an attempt to retrieve the data, but

---

[21] At one point, Sheriff Woody cites former Virginia Medical Examiner Dr. Marcello
Fierro as defining death from natural cause as involving "no foul play at all."   (Woody Dep. 35.)
Sheriff Woody offers no statute from the Virginia Code or scientific or legal theory to support this
opinion, so the Court gives it little to no weight.

were told that "when it's overwritten, it's gone." (*Id.* at 87.)   Plaintiff has since attempted to

mirror the data and retrieve the video.   They could not do so.   No party disputes the

irretrievability of the video data.

### 2.   Deputy Beaver's Differing Statements Regarding Ms. Jenkins's Last Hours in the RCJC

Ms. Jenkins spent her final sentient hours at the RCJC, and the RCJC's video surveillance

system recorded her activity.   Crucial to the Motion for Sanctions is that, because the Video Data

was not preserved, Deputy Beaver provides the only account of Ms. Jenkins's behavior on the

night before her death.   Had the Video Data been retained, its neutral record of Ms. Jenkins's last

five sentient hours could be placed alongside Deputy Beaver's testimony, so that events could be

fully evaluated.   Instead, Deputy Beaver's deposition testimony, her statements to IAD, her

notations in the Logbook, and her multiple versions of the Incident Report[22] become the sole

source of information.   Deputy Beaver's accounts do not entirely align.   While the Court lacks

the full transcripts of both depositions, some testimony from Deputy Beaver's March 14, 2016

deposition differs from that of her September 14, 2016 deposition.   Deputy Beaver's statements to

IAD Investigator Weaver also do not comport with statements in her March 2016 deposition.

And none of Deputy Beaver's testimony comports with her contemporaneous Logbook entries.

For instance, in March 2016, Deputy Beaver testified that she was only told to keep an eye

on Ms. Jenkins.   However, in September 2016, Deputy Beaver testified that Corporal

Hudson-Parham told her details about Ms. Jenkins's history, including that Hudson-Parham had

---

[22] Sheriff Woody produced four versions of an Incident Report written by Deputy Beaver.
Two reports state that Deputy Beaver called a medical emergency at approximately 11:00 p.m.,
while two reports indicate that she called at 11:04 p.m.   Deputy Beaver testified that she added
details as to what she saw Ms. Jenkins doing and what she said to Ms. Jenkins in each subsequent
version of the Incident Report "due to some confusion."   (Beaver Dep. I 101.)

tried to get Ms. Jenkins to calm down and lie back during the previous shift.   During her IAD

interview, Deputy Beaver told Weaver that "we kept trying to get her to lay down."   (Transcript of

Interview of Deputy Beaver 5, ECF No. 254-6.)   Deputy Beaver testified in her September 2016

deposition, and to the IAD investigator, that she knew Ms. Jenkins had been placed on her tier

because Ms. Jenkins had been acting erratically or strange on another tier.

Deputy Beaver consistently has stated that, per the Richmond City Sheriff's Office

Standard Operating Procedures ("SOP"), she performed nine security checks, twice an hour,

between 7:00 p.m. and 10:48 p.m.   In each Logbook entry, Deputy Beaver wrote that the security

check was "10/4," meaning that she did not see anything unusual.   In her first deposition, Deputy

Beaver testified that she made the nine "10/4" entries in the Logbook between 5:00 p.m. and 10:48

p.m. because none of the behavior she saw Ms. Jenkins exhibit was "unusual" for the 3A1

cellblock.   However, Deputy Beaver later added testimony that Ms. Jenkins was acting "real

weird like" and "like somebody who was on a drug."   (Beaver Dep. II 12.)   Deputy Beaver

explained that throughout the evening, she observed Ms. Jenkins talking to herself, walking

around the cell, using a toilet paper roll like a telephone, and tearing up paper and feeding it

through the food slot, pretending to feed her daughter.   Deputy Beaver also claims that she

performed extra security checks not recorded in her Logbook.   None of Ms. Jenkins's "weird"

behaviors appear in Deputy Beaver's Logbook, even though SOPs requires that deputies, during

security checks, look for odd or "inappropriate behavior denoting possible mental disorders,"

(Richmond City Sheriff's Office SOP 202, ECF No. 138-7).   Deputy Beaver made no such entry

for five hours on August 1, 2014, even though she had made a Logbook entry on July 30, 2014, at

5:25 a.m. stating, "E. Jenkins observed talking to self on pretend phone."   (Logbook 9, ECF

No. 138-8.)  Deputy Beaver has testified that, during those five hours in isolation in cell 3A1, Ms. Jenkins never asked her for help; never asked to be taken to the medical department; never asked for medical assistance; never said she was in pain; never said she was in discomfort; and, never reported abdominal or stomach pain.

Deputy Beaver further testified that, at approximately 10:58 p.m., she noticed that Ms. Jenkins had been sitting on the toilet for a long time—anywhere from ten minutes to an hour. Deputy Beaver visited Ms. Jenkins's cell and saw that Ms. Jenkins had urinated on the floor. Upon asking Ms. Jenkins if she was okay and why her sheet was under the bed, Deputy Beaver received a jumbled response.  At 10:59 p.m., Deputy Beaver called Nurse Paige and, without telling her about any symptoms other than Ms. Jenkins's incontinence, asked Nurse Paige to see Ms. Jenkins.  Nurse Paige informed Deputy Beaver that she was "in the middle of changing shifts," (Beaver Dep. I 62), but that she would be there "as soon as possible," (Richmond City Sheriff's Office Incident Report, August 2, 2014, ECF No. 138-22).  None of these events appear in Deputy Beaver's Logbook entries.

At some point either just before or just after calling Nurse Paige, Deputy Beaver observed Ms. Jenkins sit on the bed and lay back.  Testifying that she always looks for "hanging and chest movement," (Beaver Dep. II 13), Deputy Beaver looked again and did not see a rise and fall of Ms. Jenkins's chest.  Deputy Beaver attempted to call a medical emergency on her radio, but her radio battery did not work, so she called a medical emergency by telephone.  Additional RCJC staff arrived at Ms. Jenkins's cell to assist with the medical emergency.  Medical staff showed up immediately thereafter and began CPR.  Emergency medical responders eventually revived Ms. Jenkins, and Ms. Jenkins was transported to VCU Medical Hospital.  The RCJC video recording

20

system, before it was overwritten, captured all of the above activity in Ms. Jenkins's cell between

5:00 p.m. and 11:59 p.m. on August 1, 2014.

**F.**     **The Delayed Production:   The Withheld IAD Audio Recordings**

On October 19, 2015, Plaintiff sent her first set of interrogatories and requests for

production to Sheriff Woody.   Plaintiff requested, *inter alia*:

> 3.  Any and all findings, documents, or investigations regarding Ms. Jenkins'
>     injuries, health conditions, and/or conditions of confinement.
>
> * * * *
>
> 8.  Any electronic, audio, or visual data, showing or concerning Ms. Jenkins, or
>     anyone else engaged in efforts related to her, such as the arrivals of EMT's at
>     the "RCJC[,"] Ms. Jenkin's [sic] medical records, Ms. Jenkin's [sic] inmate
>     and/or detainee records, personnel reacting to finding Ms. Jenkins, personnel
>     re-locating Ms. Jenkins, or any additional electronic data gathered or obtained
>     by the defendant that depict the Ms. Jenkins [sic].
>
> * * * *
>
> 13. All non-privileged communications (both internal and external) concerning the
>     allegations made in the Amended Complaint.
>
> * * * *
>
> 16. Any and all communications and/or documents exchanged between you and
>     other Defendants that concern:
>
>     a.  Ms. Jenkins;
>     b.  Mental health policies and procedures;
>     c.  Contracts for observing or providing health care to inmates/detainees at the
>         Richmond City "RCJC"; [and,]
>     d.  The allegations made in the Complaint.
>
> * * * *
>
> 36. Any and all findings, documents, or investigations regarding Ms. Jenkin's [sic]
>     injuries and/or death.

(Pl.'s First Set of Interrogs. and Reqs. for Produc. 13–18, ECF No. 113-8.)

21

On December 1, 2015, Sheriff Woody identified previously-produced documents in response to Requests for Production 3, 8, and 13.   As to Request for Production 16, Sheriff Woody attached a copy of the Correct Care Solutions ("CCS")[23] contract and copies of Sheriff SOPs 249[24] and 250.[25]   In response to Request for Production 36, Sheriff Woody produced twenty-three documents.   Sheriff Woody did not produce the audio recordings of IAD investigators' interviews in his initial response to these Requests for Production.

On April 18, 2016, six months after Sheriff Woody's initial responses to Plaintiff's interrogatories and requests for production, Plaintiff deposed Lawson, who eventually confirmed that Audio Recordings for IAD interviews were the norm.   Lawson testified that, although he "wanted an on and off switch" in the IAD interview rooms, the recording system is "always recording," but that an investigator can exercise some discretion to have it both "run" and "record" via computer.   (Lawson Dep. 38–43.)   As with the jail cell videos, Lawson confirmed that he could not recall a time when the IAD investigative file did not contain CDs with audio or video recordings.

On April 26, 2016, eight days after this deposition testimony from Lawson, Sheriff Woody produced the audio recordings of the IAD investigative interviews.   Sheriff Woody, through counsel, stated that "the audio recordings of the investigative interviews were produced within a week of counsels' learning of their existence."   (Woody's Opp'n Pl.'s Mot. 13.)   Sheriff

---

[23] CCS contracted with Sheriff Woody to provide medical services for the RCJC.

[24] SOP 249 governs Sheriff's Office Policies on "Medical Operations."

[25] SOP 250 governs Sheriff's Office Policies on "Mental Health/Suicide Prevention."

22

Woody's response entirely fails to address why Sheriff Woody himself failed to produce the audio recordings at any time in the six months after his initial response to Plaintiff's discovery requests.

## II.   Legal Standard for Spoliation of Evidence

Spoliation of evidence refers to "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).   The duty to preserve evidence arises "not only *during* litigation but also extends to that period *before* litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id.* at 591 (emphasis added) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

A federal district court's power to sanction a party for spoliation of evidence derives from two sources:  (1) the Federal Rules of Civil Procedure; and, (2) the court's "inherent power to control the judicial process and litigation." *Id.* at 590.   A district court has broad discretion to choose the appropriate sanction for a party's spoliation, but should use that discretion "to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* (quoting *West*, 167 F.3d at 779).   Any sanction imposed should be "designed to:  (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and[,] (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'" *West*, 167 F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126).

The United States Court of Appeals for the Fourth Circuit has not yet decided the burden of proof in sanctions cases.   *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *2

(D. Md. Aug. 20, 2010) ("Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this Court's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit."). Some courts have applied the preponderance of the evidence standard. *See, e.g., McIntosh v. United States*, 2016 WL 1274585, No. 14-cv-7889, at *33 (S.D.N.Y. March 31, 2016) ("'[A] party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence.'") (citing *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014)). Other courts have required clear and convincing proof of misconduct, especially when imposing severe sanctions. *Suntrust Mortg., Inc. v. AIG United Guar. Corp.*, No. 3:09cv529, 2011 WL 1225989, at *20 (E.D. Va. Mar. 29, 2011), *aff'd sub nom. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 508 F. App'x. 243 (4th Cir. 2013) (collecting cases). Because the Court's decision would remain the same under either standard and Plaintiff seeks the most severe of sanctions, the Court will apply the clear and convincing standard of proof to Plaintiff's Motion for Sanctions.

Federal Rule of Civil Procedure 37 governs a federal district court's power to sanction a party for destroying or failing to preserve electronically stored information ("ESI"). Rule 37(e) governs parties' failure to preserve ESI. Effective December 1, 2015, Rule 37(e) was amended. Amended Rule 37(e), relative to its predecessor,[26] significantly limits a court's discretion to impose sanctions for the loss or destruction of ESI, such as the Video Data. Fed. R. Civ. P. 37(e)

---

[26] Previous Federal Rule of Civil Procedure 37(e) provided: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."

advisory committee's note to 2015 amendment [hereinafter "Fed. R. Civ. P. 37(e) advisory

committee's note"]. As amended, Rule 37(e) provides in full:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically
> stored information that should have been preserved in the anticipation or
> conduct of litigation is lost because a party failed to take reasonable steps to
> preserve it, and it cannot be restored or replaced through additional discovery,
> the court:
>
> > **(1)** upon finding prejudice to another party from loss of the information, may
> > order measures no greater than necessary to cure the prejudice; or[,]
> > **(2)** only upon finding that the party acted with the intent to deprive another
> > party of the information's use in the litigation may:
> >
> > > **(A)** presume that the lost information was unfavorable to the party;
> > > **(B)** instruct the jury that it may or must presume the information was
> > > unfavorable to the party; or[,]
> > > **(C)** dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).[27] This new iteration of Rule 37(e) applies to all civil cases commenced after

December 1, 2015, and to all proceedings pending on that date, unless its application "would be

infeasible or work an injustice." Fed. R. Civ. P. 86. In briefing, the parties have invoked and

relied on the new Rule 37(e), and the Court finds that its application here would not be infeasible

or work an injustice.[28]

---

[27] The new Rule 37(e) explicitly overruled some previously-established rules governing a
court's evaluation of spoliation. *See, e.g.*, Fed. R. Civ. P. 37(e) advisory committee's note
(discussing how the amendment to Rule 37(e)(2) "rejects cases such as *Residential Funding Corp.
v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of
adverse-inference instructions on a finding of negligence or gross negligence.") However, the
amended rule also expressly *retained* some previously-established rules regarding spoliation, such
as "court decisions hold[ing] that potential litigants have a duty to preserve relevant information
when litigation is reasonably foreseeable." *Id.* Thus, "Rule 37(e) is based on this common-law
duty [to preserve]; it does not attempt to create a new duty to preserve." *Id.*

[28] Although the Video Data was destroyed with the former Rule 37(e) in effect, the Court
finds that applying the new Rule 37(e) is neither infeasible nor unjust. Discovery in this matter
did not commence until the new rule was in effect; Plaintiff moved for sanctions while the new

## III.  Analysis

### A.    The Court Will Impose Sanctions

The text of Rule 37(e) establishes a multi-step analysis that courts must apply to determine if sanctions (or curative measures) are appropriate.   Under Rule 37(e), before a court may impose sanctions, four requirements must be met.   Fed. R. Civ. P. 37(e).   First, some "ESI" must have been "lost."   *Id.*   Second, that information (or evidence) must be of the sort that "should have been preserved in the anticipation or conduct of litigation."   *Id.*   Third, the evidence must have been lost "because a party failed to take reasonable steps to preserve it."   *Id.*   Finally, the court must find that the evidence "cannot be restored or replaced through additional discovery."   *Id.*

### 1.    The Video Data Constitutes ESI that was Lost

No party asserts that the Video Data does not constitute ESI.   Also, all parties agree that the Video Data cannot be recovered.   Although Plaintiff's FOIA request was made within the thirty-day window in which video recordings were supposed to have been saved on the server, the cameras in Section 3A1, where Ms. Jenkins was housed, "record[ed] more than [they were] supposed to record because the motion sensitivity was set too high, and therefore the amount of expected data was taken up quicker than 30 days."   (Witham Dep. 84.)   By the time RCJC staff attempted to retrieve the Video Data, "the data was overwritten from that event."   (*Id.*)   And "when it's overwritten, it's gone."   (*Id.* at 87.)

---

rule was in effect; all parties briefed their arguments under the new rule; and, the new rule still allows the Court to impose a broad range of sanctions to remedy any prejudice experienced by Plaintiff.

## 2. The Video Data Should Have Been Preserved in Anticipation of Litigation

The crux of the parties' argument centers on whether Sheriff Woody had a duty to preserve the Video Data in anticipation of litigation.[29]  Two issues are relevant in this analysis:  (1) should Sheriff Woody reasonably have anticipated litigation regarding Ms. Jenkins's death; and, (2) should Sheriff Woody reasonably have known that the evidence contained in the Video Data might be relevant to any anticipated litigation.  *See Silvestri*, 271 F.3d at 591.  The Court answers both in the affirmative.

### a. Sheriff Woody Should Reasonably Have Anticipated Litigation Regarding Ms. Jenkins's Death as Soon as She Died

"It is well established that the duty [to preserve evidence] is triggered, at the latest, when the defendant is served with the complaint." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 512 (S.D. W. Va. 2014) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010)).  However, the duty to preserve "also extends to that period before the litigation when a party reasonably should . . . anticipate[] litigation." *Silvestri*, 271 F.3d at 591.  Although a defendant clearly must preserve evidence once informed by a putative plaintiff of intent to file a lawsuit, "a future litigant is not required to make such a request, 'and a failure to do so does not vitiate the independent obligation of an adverse party to preserve such information' if the adverse party knows or should know of impending litigation." *Victor Stanley*, 269 F.R.D. at 522 (quoting *Thompson v. U.S. Dep't Hous. & Urban Dev.*, 219 F.R.D. 93, 100

---

[29] The parties express disagreement about whether Sheriff Woody *destroyed* or simply *failed to preserve* the Video Data, regardless of whether he had any duty to preserve it.  That distinction bears no relevance to this situation because the law views both destruction of evidence and failure to preserve evidence as spoliation.  *See Silvestri*, 271 F.3d at 590 ("Spoliation refers to the *destruction* or material alteration of evidence *or to the failure to preserve* property for another's use as evidence in pending or reasonably foreseeable litigation." (emphasis added)).

27

(D. Md. 2003)). "These general rules are not controversial. But applying them to determine when a duty to preserve arises in a particular case and the extent of that duty requires careful analysis of the specific facts and circumstances." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010).

Sheriff Woody claims that he could not reasonably anticipate litigation regarding Ms. Jenkins's death in his custody until August 26, 2014,[30] when he received the FOIA request from Ms. Jenkins's counsel. Sheriff Woody contends that he could not reasonably anticipate litigation before then because his duty to preserve evidence, including the Video Data, did not arise until August 26, 2014.[31] Because the video had been automatically overwritten by then, Sheriff Woody contends that no spoliation occurred. This argument fails to persuade because clear and convincing evidence suggests that Sheriff Woody should reasonably have anticipated litigation after Ms. Jenkins died in RCJC custody.

First, the RCJC's commonsense policy of beginning an IAD investigation "immediately" after an inmate dies in RCJC custody to "determine whether there was any evidence of foul play," (Woody Dep. 17), likely exists, at least in part, because of a reasonable anticipation of litigation.

---

[30] Sheriff Woody actually states that "the duty to preserve arose on *August 25, 2014*, when plaintiff's counsel submitted a FOIA request to Sheriff Woody." (Woody's Opp. Pl.'s Mot. Sanctions 5 (emphasis added).) However, Deputy Beaver attaches a copy of the FOIA request Plaintiff submitted to Sheriff Woody in her Response to Plaintiff's Motion for Sanctions, and the letter is dated August 26, 2014.

[31] Deputy Beaver unpersuasively contends that the duty to preserve did not even arise at the time Plaintiff submitted the FOIA request. In doing so, Deputy Beaver suggests that because the letter lacked an explicit threat of imminent suit or a direct request for a litigation hold, this Court cannot find that Sheriff Woody should reasonably have anticipated litigation. First, Deputy Beaver appears to misread the letter and its request for video and ESI information. In any event, Sheriff Woody precludes Deputy Beaver's contention by saying he was on notice as of August 26, 2014.

Second, given the high number of lawsuits involving inmate deaths in his custody, and naming Sheriff Woody as a defendant, Sheriff Woody should certainly have anticipated litigation when another inmate died while in custody only four days after his new facility formally opened. Finally, when asked, Sheriff Woody confirmed, under oath, that "when people die in the jail, [it is] common for lawsuits to follow."   (*Id.* at 30.)   These three circumstances together, especially Sheriff Woody's own admissions, constitute clear and convincing evidence that Sheriff Woody could reasonably anticipate litigation when Ms. Jenkins died on August 2, 2014.[32]

        **b.     Sheriff Woody Should Reasonably Have Known that the Evidence in the Video Data Would Be Relevant to Any Anticipated Litigation**

Litigants need not, "upon recognizing the threat of litigation preserve every shred of paper, every e-mail or electronic document, and every backup tape."   *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003).   However, "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."

---

[32] Even if Sheriff Woody were to claim that Ms. Jenkins's death itself did not put him on notice that a lawsuit would occur, the date he learned about Ms. Jenkins's cause of death might serve as an alternate date.   This is true because Ms. Jenkins died from a perforated duodenal ulcer—the same cause of death affecting Michael Cosby, who died in the old Richmond City Jail just four months before Ms. Jenkins.   Having two inmates die of the same "natural" cause within four months of each other is, the Court hopes, an extremely unusual situation for Sheriff Woody—one that he would notice and that would alert him to the possibility, if not likelihood, of litigation.

Thus, the date of Ms. Jenkins's autopsy report, which lists her cause of death, might serve as a different date on which Sheriff Woody was on notice of litigation.   While Sheriff Woody likely learned of Ms. Jenkins's cause of death before any formal report issued, Sheriff Woody represented to the Court—in briefing and at oral arguments—that RCJC received Ms. Jenkins's autopsy report on August 19, 2014.

As an aside, these circumstances belie Sheriff Woody's suggestion that "natural" causes of death absent "foul play" do not provide notice of litigation.   It is not just this case that involves a failure to provide treatment or a condition of confinement that causes total physiological breakdown; Sheriff Woody has seen other cases like this where a "natural" cause of death nonetheless results in litigation.   To the extent he asserts otherwise, he fails to persuade.

*Id.*   When reasonably anticipating litigation, a party must "preserve what it knows, or reasonably

should know, is relevant in the action, . . . [or] is reasonably likely to be requested during discovery

and/or is the subject of a pending discovery request."   *Id.* (quoting *Turner v. Hudson Transit

Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).

Once Ms. Jenkins died in his custody and Sheriff Woody reasonably anticipated litigation,

he had a duty to preserve evidence he knew or reasonably should have known was relevant.   As

Sheriff Woody himself admits, videos constitute unique and relevant evidence.

> [Y]ou can use it for investigative purposes.   You can use it for safety purposes.
> You can use it for people that's—the resident them self [sic] who lies oftenly [sic]
> about how something happened and what happened before.
>      And so it's a—sort of a truth serum.   [It can be] very, very helpful [as] just
> a *real live thing* of what's happening, what—*what really happened.*

(Woody Dep. 27 (emphasis added).)   Consistent with RCJC practice, someone investigating an

incident would want to review any video evidence at "the earliest convenience" in order to get an

objective "perspective on things that happened."   (Lawson Dep. 50; 24–25.)   According to

Sheriff Woody, any investigation should begin "immediately."   (Woody Dep. 116.)   The Video

Data not only constituted relevant evidence that Sheriff Woody had a duty to preserve, but it held

the best evidence, both neutral and objective, of Erin Jenkins's last cognizant hours.

### 3.      The Video Data was Lost Because Sheriff Woody Failed to Take Reasonable Steps to Preserve It

Although Sheriff Woody did not have a duty to "preserve every shred of paper, every

e-mail or electronic document, and every backup tape," *Zubulake,* 220 F.R.D. at 217, he had a duty

to take reasonable steps to preserve relevant evidence, including the Video Data.   The record

demonstrates, clearly and convincingly, that Sheriff Woody did not take those steps.   This is true,

in part, because by deviating from his own practices, he lost crucial—but easily saved—evidence otherwise routinely preserved in the course of an IAD investigation.

As noted earlier, IAD investigators routinely create a disk of available video surveillance when investigating an inmate's death.   (Lawson Dep. 54.)   An IAD investigator simply "put[s] a disk in and push[es] a button and it will make a recording."   (*Id.*)   The disk remains in the inmate's IAD file, which the RCJC preserves indefinitely.   (*Id.* at 55.)   Sheriff Woody and Lawson expect this to happen immediately, or within one or two days of the incident.   Complying with Sheriff Woody's own internal practices certainly would have constituted reasonable steps to preserve uniquely relevant evidence.   And given the ease with which RCJC investigators can preserve video surveillance records, even if the RCJC did not have a practice of doing so, the Court would still find that step mandatory once the RCJC reasonably anticipates litigation.   The Video Data was lost because Sheriff Woody failed to take reasonable steps to preserve it.

**4.      The Video Data Cannot be Restored or Replaced Through Additional Discovery**

In April, the Court allowed the Plaintiff to "attempt to copy or mirror image the hard drive" of the video surveillance cameras in the RCJC because Sheriff Woody had been unable to recover the Video Data.   (Transcript of Discovery Dispute 33.)   Plaintiff's attempt failed.   The Video Data cannot be restored.

Sheriff Woody does not argue that the Video Data could be or has been replaced through additional discovery, but Deputy Beaver contends that "the digital video would be cumulative, and [Plaintiff] does not explain what the digital video contains, or might contain, that would add anything to what she has learned through depositions and written documents."   (Beaver's Opp'n Pl.'s Mot. 12.)   Deputy Beaver claims that because "Plaintiff has deposed Deputy Beaver, the

31

person who found Ms. Jenkins unresponsive, as well as the other deputies (and CCS employees) who responded," any evidence that Plaintiff could gain from the Video Data has been replaced through additional discovery.  (*Id.*)  This claim entirely lacks merit.

Deputy Beaver argues against the timeless principle that a picture is worth a thousand words.  When presented to a jury, testimony and Logbook entries provide poor substitute for audio and images of Ms. Jenkins while she was still alive.  Testimony about an inmate talking to herself, feeding her imaginary daughter ripped-up pieces of toilet paper, and using a toilet paper roll as a telephone likely would impact a jury entirely differently than if the jury actually watched the video of an inmate experiencing those same auditory and visual hallucinations in an isolation cell.  Great impact also would flow from video depicting the frantic moments as others tried to revive Ms. Jenkins.  Most importantly though, without the video, Plaintiff loses the best and most objective evidence of whatever happened on August 1, 2014.  Even assuming—which the Court does not one way or the other—that the information on the Video Data would have confirmed rather than contradicted Deputy Beaver's testimony and Logbook entries, the Video Data would still remain the "best," and not cumulative, evidence.  The Video Data constitutes critical evidence that cannot be restored or replaced through additional discovery.

Because the Court finds that the Video Data constituted "ESI that should have been preserved in the anticipation or conduct of litigation[, was] lost because a party failed to take reasonable steps to preserve it, and . . . cannot be restored or replaced through additional discovery," Fed. R. Civ. P. 37(e), the Court then turns to the next prong of the analysis: determining whether Sheriff Woody acted with intent to deprive Ms. Jenkins of the video's use in litigation.

32

**B.**     **The Court Declines to Find Intent**

Rule 37(e) now reserves the harshest discovery sanctions, such as adverse inference instructions, dismissals, or default judgments, only for cases in which the court can "fin[d] that the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Plaintiff asks this Court to find that Sheriff Woody intentionally sought to deprive her of the critical Video Data. In seeking sanctions, Plaintiff invites the Court to consider Sheriff Woody's unexplained delay in disclosing the IAD audio files, his earlier failure to answer interrogatories properly, and the plethora of suspicious memory lapses and broken policies regarding preservation of the Video Data to conclude, therefrom, that circumstantial evidence establishes that Sheriff Woody intentionally destroyed the Video Data. In response, Sheriff Woody contends that an unintentional deletion of data and a swiftly-corrected nondisclosure of audio files cannot rise to the high level of intent warranting the severe sanctions articulated in Fed. R. Civ. P. 37(e)(2).

Rule 37(e)'s stringent "intent" requirement does not parallel other discovery standards. *Cf. Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008) (explaining that spoliation, though not conducted in bad faith, could still be intentional, willful, or deliberate); *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 287 (E.D. Va. 2001) (explaining that "the intentional destruction of documents does not imply that bad faith is necessary" for imposition of sanctions for spoliation). The Fourth Circuit, like most circuits, has yet to interpret the new Rule 37(e). The standard for proving intent under that rule is not settled. Here, Plaintiff argues that intent not only can, but often must, be proved circumstantially. Sheriff Woody and Deputy Beaver, however, suggest that only direct evidence could establish intent, especially in the context of the new rule.

33

However, even considering the circumstantial evidence to establish Sheriff Woody's intent, the Court does not find sufficient proof of intent directed toward depriving Plaintiff of use of the Video Data to justify imposition of the harsh sanctions of default or an adverse inference instruction under the new Rule 37(e).   While some aspects of this record give this Court significant pause,[33] the Court is unable to find that Sheriff Woody had the requisite level of intent to deprive Ms. Jenkins of use of the information at issue in litigation.   As such, the Court denies Plaintiff's request to impose default judgment or to give an adverse inference instruction.   But that does not end the Court's analysis.

### C.   Plaintiff Has Suffered Grave Prejudice from the Loss of the Video Data

"[U]pon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice . . . ."   Fed. R. Civ. P. 37(e)(1). When imposing sanctions under Rule 37(e)(1), "[t]he range of [curative] measures is quite broad" and "much is entrusted to the court's decision."   Fed. R. Civ. P. 37(e) advisory committee's note.

> In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than [adverse inference instructions].

*Id.*

---

[33] Such circumstances include:   (1) Sheriff Woody has exclusive control over the building and the evidence; (2) many jail employees demonstrated an unnerving lack of curiosity about viewing the Video Data; (3) many employees seemed equally unconcerned about asking each other to do so; (4) some employees evinced surprisingly weak memories about important events (including whether they viewed the video); (5) the failure to review the video runs counter to common sense and fundamental investigative principles; and, (6) Sheriff Woody not only failed to preserve the Video Data, but also failed to timely disclose the IAD audio files.

A district court has broad discretion to choose the appropriate sanction for a party's spoliation, but should use that discretion "to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri,* 271 F.3d at 590 (quoting *West,* 167 F.3d at 779). Any sanction imposed should be "designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and[,] (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'" *West,* 167 F.3d at 779 (quoting *Kronisch,* 150 F.3d at 126).

The Court must repeat its finding that, by making the Video Data unavailable, Sheriff Woody has deprived Plaintiff of the best and most compelling evidence of what happened in cell 3A1 in the evening of August 1, 2014. The Video Data would have been the only unbiased and dispassionate depiction of events that occurred between 5:00 p.m. and 10:48 p.m. on August 1, 2014, when Ms. Jenkins collapsed, was taken to the hospital, and ultimately died. Plaintiff's prejudice is immense.

Given the unique and vital nature of the evidence, the Court will order sanctions for Sheriff Woody's destruction of, or failure to preserve, the Video Data. The Court will order the following:

(1)    The Court will tell the jury that the video was not preserved;

(2)    The Court will allow all parties to present evidence and argument at trial regarding Sheriff Woody's destruction of, or failure to preserve, the Video Data. The jury will be instructed that it may consider that evidence, along with all the other evidence in the case, in making its decision;

(3)    The Court will preclude any evidence or argument that the contents of the video corroborated the Defendants' version of events;

(4)    The Court will preclude any evidence or argument that on August 1, 2014,

35

Erin Jenkins was exhibiting "the same," "identical," or "similar" symptoms as those she demonstrated on July 31, 2014, when she was seen by Dr. Emran; and,

(5)   The Court will award fees to Ms. Jenkins, subject to briefing and oral argument, where all parties may be heard as to the propriety of, and the extent of, reasonable fees and expenses.[34]

The Court finds that these sanctions are necessary, but not greater than necessary, to cure the significant prejudice Plaintiff has experienced as a result of Sheriff Woody's spoliation of the Video Data.

**C.   Plaintiff Has Suffered Prejudice from Sheriff Woody's Late Disclosure of the IAD Audio Files**

The Court evaluates the delayed disclosure of the IAD audio files under Federal Rule of Civil Procedure 37(d)(1)(A)(ii), not Federal Rule of Civil Procedure 37(e).   Under Rule 37(d), a district court may, on motion, sanction a party if the "party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers,

---

[34] Although Deputy Beaver had no obligation to preserve the Video Data, and "sanctions are most appropriately directed at 'the party having control over the evidence' who had 'an obligation to preserve it at the time it was destroyed,'" *Thomas v. Butkiewicus*, 2016 WL 1718368, No. 3:13cv747 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)), Sheriff Woody's spoliation of the Video Data nonetheless severely prejudices Plaintiff's ability to prove her case against Deputy Beaver.
As Sheriff Woody's co-defendant, sanctions (1), (2), (3), and (4) will necessarily apply to Deputy Beaver.   However, the Court will allow Deputy Beaver to present evidence and testify fully as to her version of the events of August 1, 2014.   The Court, therefore, is not hobbling Deputy Beaver's ability to present a defense.   Also, the jury will be given the minimal instruction that it may consider evidence that the Video Data was lost along with all the other evidence in the case.   Finally, the Court will impose no monetary sanctions against Deputy Beaver.   The Court finds these remedial "measures no greater than necessary to cure the prejudice" Plaintiff has experienced from the missing evidence.   *See* Fed. R. Civ. P. 37(e).

36

objections, or written response." Fed. R. Civ. P. 37(d)(1)(A)(ii).   Available sanctions under Rule

37(d) include:

(i)    directing that the matters embraced in the order or other designated facts be
       taken as established for purposes of the action, as the prevailing party
       claims;

(ii)   prohibiting the disobedient party from supporting or opposing designated
       claims or defenses, or from introducing designated matters in evidence;

(iii)  striking pleadings in whole or in part;

(iv)   staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part; [or,]

(vi)   rendering a default judgment against the disobedient party . . . .

Fed. R. Civ. P. 37(b)(2)(A).

Remembering that sanctions should "serve the prophylactic, punitive, and remedial

rationales underlying the spoliation doctrine," *Silvestri*, 271 F.3d at 590 (quoting *West*, 167 F.3d at

779), the Court will impose only monetary sanctions against Sheriff Woody for his failure to

timely produce the IAD audio files.   Although Sheriff Woody disclosed the IAD audio files more

than six months after Plaintiff initially requested them, Plaintiff ultimately received that

information well before discovery in this case closed on November 21, 2016.   In the interim,

Plaintiff apparently took a second deposition of Weaver.   (Woody Mem. Opp. 13, ECF No. 114.)

Although some of Plaintiff's discovery was no doubt delayed or repeated, Plaintiff does not

suggest any prejudice other than delay that could not be cured.

The Court will therefore impose only monetary sanctions against Sheriff Woody under

Rule 37(b)(2)(C).   Sheriff Woody presents no evidence that his failure to timely disclose the IAD

audio files was substantially justified.   To the contrary, counsel's representation that "the audio

recordings of the investigative interviews were produced within a week of *counsels' learning of their existence*," (Woody's Opp'n Pl.'s Mot. 13 (emphasis added), strongly suggests that Sheriff Woody failed to disclose the existence of these audio files even to his own attorneys.   These audio recordings were responsive to five of Plaintiff's First Set of Requests for Productions, sent to Sheriff Woody on October 19, 2015.   Sheriff Woody produced the audio files within seven days of "counsels' learning of their existence," implying that the files were readily accessible. Sanctions are designed to curb precisely such obfuscating discovery practice.   Because the evidence before the Court indicates that Sheriff Woody's sanctionable behavior wasted Plaintiff's time and money, but did not prejudice, ultimately, her ability to gather evidence in support of her case, the Court will impose only monetary sanctions against Sheriff Woody.

The Court will direct Plaintiff to submit evidence regarding the time and money she spent as a result of Sheriff Woody's late disclosure of the IAD audio files.

### IV.   Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Sanctions, (ECF No. 112), pursuant to Federal Rules of Civil Procedure 37(e) and 37(d).

/s/
M. Hannah Lauck
United States District Judge

Date: 1/21/17
Richmond, Virginia

38